[Sac. No. 4513. In Bank.—August 29, 1931.]

J. C. HENDERSON, Respondent, v. OROVILLE–WYANDOTTE IRRIGATION DISTRICT (a Public Corporation), Appellant.

[Sac. No. 4514. In Bank.—August 29, 1931.]

J. E. RUTHERFORD et al., Respondents, v. OROVILLE–WYANDOTTE IRRIGATION DISTRICT (a Public Corporation), Appellant.

Raymond A. Leonard and Chickering & Gregory for Appellant.

George F. Jones and Sanborn, Roehl, Smith & Brookman for Respondents.

Athearn, Chandler & Farmer and Frank R. Devlin, Hankins & Hankins, A. L. Cowell, Griffin & Boone and Chas. L. Childers, as *Amici Curiae*.

CURTIS, J.—These two actions, which have been consolidated on appeal, were instituted under the provisions of sections 1060 to 1062a of the Code of Civil Procedure by the plaintiffs on behalf of themselves and other land owners and water users situated outside of the exterior boundaries of the defendant, the Oroville-Wyandotte Irrigation District, for a determination of their rights and duties and those of the said irrigation districts in the service of water to them by said district and the rates to be charged therefor. These actions have been before this court on a prior appeal wherein this court reversed the action of the trial court in sustaining demurrers to the complaints of the plaintiffs. (*Henderson* v. *Oroville-Wyandotte Irr. Dist.*, 207 Cal. 215 [277 Pac. 487]; *Rutherford* v. *Oroville-Wyandotte Irr. Dist.*, 207 Cal. 786 [277 Pac. 489].) Thereafter a trial was had in the Superior Court of the County of Butte, and the plaintiff

in each action was awarded judgment. From these judgments the defendant district has appealed. After the commencement of the present actions Charles Dankert instituted in this court a proceeding against said irrigation district requiring it to furnish to said plaintiff and other land owners and water users situated like himself water from the irrigaton system of the defendant district at certain rates set forth in the petition filed therein. After giving due consideration to said petition, we declined to decide the merits of the questions involved therein on the ground that they were the same as those presented on the joint appeal now before us. (*Dankert* v. *Oroville-Wyandotte Irr. Dist.*, 211 Cal. 87 [293 Pac. 785].)

The defendant Oroville-Wyandotte Irrigation District was organized on July 8, 1919, as a public corporation and irrigation district under the laws of the state of Calfornia, and has continued to exist and operate as such since the date of its organization. For some time prior to the organization of said district the Palermo Land and Water Company (which we will hereafter refer to as the Palermo Company) and the South Feather Land and Water Company (hereinafter referred to as the South Feather Company) owned and operated two separate and distinct systems of canals in the vicinity of Oroville, Butte county, and supplied water, owned by them respectively, as public utilities, subject to the jurisdiction of the Railroad Commission to fix the rates charged to consumers under their respective systems, for irrigation, domestic and mining purposes. After the organization of the defendant district negotiations were begun looking to the acquisition by said district of the water rights and irrigation systems of the Palermo and South Feather Companies. Two applications were filed before the Railroad Commission on June 30, 1922, one by the Palermo Company entitled application No. 8000, and the other by the South Feather Company entitled No. 8018, asking for the authorization of the Railroad Commission to the transfer to the district of the two public utility water systems owned and operated by said companies. These applications were filed in pursuance of section 51 (a) of the Public Utilities Act (Stats. 1915, p. 149, § 51(a), which requires the consent of the Railroad Commission to the sale and transfer of any public utility property. It

appears that a portion only of the lands served with water from these two public utilities were included within the boundaries of said irrigation district. The outside users naturally became apprehensive regarding this proposed change in ownership of the water systems from which they were being served with water for their said lands, and appeared before the Railroad Commission and filed their protest against this transfer of said public utility systems to the irrigation district until the district should give "guaranties as to future rates to be charged for water and the service to be rendered and also that some provision be made for water users (without the district) to join the irrigation district". Hearings in these proceedings were held before Examiner Satterwhite at Oroville and San Francisco at which all interested parties were notified and given an opportunity to appear and be heard. Pending these hearings and prior to the final order of the Railroad Commission granting authority to make said transfers, the defendant irrigation district at a duly called meeting of its board of directors held on the twentieth day of October, 1922, adopted two resolutions, one applicable to the Palermo Company and the other to the South Feather Company, in which it set forth the terms and conditions upon which it would furnish water to the outside water users in the event authority was granted by the Railroad Commission to make the transfer to it of said two irrigation systems. These resolutions will be hereafter referred to more in detail. Certified copies of these resolutions were filed with the Railroad Commission, whereupon it granted authority to the two public utilities to transfer their property to the defendant district upon the conditions specified in the two resolutions of the district. The opinion and order of the Railroad Commission are quite lengthy and we will set forth herein only the parts thereof that are material to the questions involved upon these appeals. After reciting that the applications were made by the utilities to transfer their properties and that the same were opposed by water users residing outside of the district; that hearings were held and that "the matter was submitted without any definite proposal from the district", the opinion continues:

"After a number of conferences between representatives of the Commission, the companies, the district, and the

protestants, the district and the protestants agreed on a form of proposal to be submitted, whereupon the Commission ordered the matters reopened and set a day for hearing, that the proposal could be submitted and made a part of the record in these proceedings.

"This proposal, applying to the water users of the Palermo system, is in the form of a resolution of the Board of Directors of the district, and is set out in full below:

" 'On motion duly made, seconded and unanimously carried, the following resolution was adopted:

" 'Whereas, on the 30th day of June, 1922, there was filed Application Number 8000 with the Railroad Commission of the State of California, which application is entitled: In the matter of the application of Palermo Land & Water Company, a corporation, to sell its water system, and F. F. Ford and Oroville-Wyandotte Irrigation District to purchase the same,

" 'And whereas, said application was filed for the purpose of said Palermo Land & Water Company receiving permission from the Railroad Commission of the State of California to sell its water system to the Oroville-Wyandotte Irrigation District, and

" 'Whereas, a public hearing on said application was held at Oroville, California, on the 22nd day of August, 1922, and

" 'Whereas, at the said hearing the present water users of the Palermo Land & Water Company did file a protest against the granting of the said application, and

" 'Whereas, in consideration of the said present water users withdrawing their said protest the said Oroville-Wyandotte Irrigation District does agree to enter into contracts with each of said water users accepting this offer as herein set forth within six months from date hereof,

" 'Whereas, the term "present water users" is hereby declared to mean the owners, their heirs, successors, grantees and assigns of land supplied with water from the water system of the Palermo Land & Water Company and which lands are not now in the Oroville-Wyandotte Irrigation District,

" 'Now, therefore, be, and it is hereby resolved that the president and secretary of the Oroville-Wyandotte Irriga-

tion District, be, and they are hereby directed and empowered to enter into the above mentioned contract or contracts, for and on behalf of the said Oroville-Wyandotte Irrigation District and in its name, and in accordance with the terms and conditions herein contained.

" 'First.

" 'That the said water users, and each of them shall be entitled to and shall receive one (1) inch of water, continuous flow, for every four (4) acres of land. The amount of water now supplied to said water users shall continue to be so supplied by the said Irrigation District and shall be part of the said one (1) inch of water for every four (4) acres of land, and the additional water necessary to make one inch of water continuous flow for every four (4) acres of land shall be available to said water users from the first water developed by the said District.

" 'Second.

" 'That the present rate of twenty-two cents (22cts.) per miner's inch continuous flow per day of twenty-four hours of water for irrigation purposes, with a minimum charge of five dollars ($5.00) per acre per year, shall be the rate charged by the District and paid by the water users for the said water until January first, 1928. The District shall not charge any rate for said water in excess of the rates above specified.

" 'Third.

" 'If at any time, five (5) years after the first construction work has been started by said Irrigation District, any of the present water users shall make a legal application to have their lands included in the said Oroville-Wyandotte Irrigation District, and said application shall be rejected by said Oroville-Wyandotte Irrigation District, then and in that event the said water user shall pay the same charge for water on his land as is paid for water within the Oroville Wyandotte Irrigation District. The said Irrigation District shall act upon said application within ninety (90) days from the date of the filing thereof.

" 'Fourth.

" 'That the above mentioned rates specified in paragraph two hereof shall not be raised after January first, 1928, provided however that should the charge paid for water within the said District exceed the sum of twenty-two cents

(22cts.) per inch, then and in that event the present water users shall pay the same charge as is paid within said district.

" 'Fifth.

" 'All the existing rights of the present water users shall continue and this agreement is an addition to all the rights and benefits they now possess.

" 'Sixth.

" 'Should any of the present water users at any time have their lands included within the Oroville-Wyandotte Irrigation District, then and in that event this agreement shall be null and void, as to such water users.

" 'Be it further resolved, that the secretary of the Oroville-Wyandotte Irrigation District be, and he is hereby directed to file a certified copy of this resolution with the Railroad Commission of the State of California, as part of the records of Application Number 8000, as a stipulation by the District in said proceedings to the end that the said commission may proceed to make its order in said matter.

" '(Signed)   J. A. WISNER (attest),
" 'Secretary.

" 'Approved:
" '(Signed)   R. C. TYLER,
" 'Chairman.'

"The proposal applying to the water users of the South Feather system is identical in terms with the above, with the exception of the rate, which has been made $50 per miner's inch per season. This is a reduction of $10 per miner's inch per year from the present rate established by this Commission. The reduction in rate on the South Feather system makes the charges for the quantity of water the same on both systems, as the Palermo Land and Water Company delivers and sells water on the basis of 50 miner's inches per second-foot, while the South Feather Land and Water. Company uses 40 miner's inches per second-foot.

"Upon the presentation of this proposal at the further hearing of the matter, the protestants formally withdrew their objections to the transfer.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"Inasmuch as the applications filed with the Commission did not specifically set out the status of the water users outside the district or indicate the rates to be charged and

service to be rendered, but only generally referred to same as set out in the deed of conveyance hereinbefore referred to, the Commission believed that a transfer under such conditions would not have properly safeguarded the rights of the water users, and purposely delayed authorization of the transfer until something more definite was offered the water users. Now that a method has been proposed whereby the water users outside the district are given reasonable protection as to service and rates, and because of which the protestants withdrew their protest to the transfer, the Commission now believes that public convenience will best be served by granting the authority sought, subject to the conditions contained in the applications and in the proposals submitted in connection therewith.

"Order.

"Palermo Land and Water Company and South Feather Land and Water Company, public utility water corporations, having filed applications with this Commission for authority to transfer their public utility properties to F. F. Ford and Oroville-Wyandotte Irrigation District, and F. F. Ford having indicated in writing his desire that the Commission authorize the transfer of these properties to the District direct, the Oroville-Wyandotte Irrigation District having joined in these applications, hearings having been held and the matters having been submitted.

"It is hereby ordered that the applications designated above be and the same are hereby granted, subject to the following conditions:

"That the present water users of the two water companies parties hereto, and those persons or firms desiring to become water users within ten (10) years from the date hereof, shall receive service from the Oroville-Wyandotte Irrigation District at the rates and under the conditions recited in Application 8000 and Application 8018 and in the resolutions of the directors of the Oroville-Wyandotte Irrigation District dated October 20, 1922, submitted and marked as Exhibit 4 in Application No. 8000 and Exhibit 5 in Application No. 8018.

. . . . . . . . . . . .

"Within thirty (30) days after its execution the Oroville-Wyandotte Irrigation District shall file with the Commission a verified copy of the deed under which it has

secured and holds title to the properties authorized to be transferred.''

Thereafter the two public utilities conveyed to the district their respective water rights and irrigation systems. After the acquisition of these rights and the irrigation systems, the district continued to operate them, and delivered water to the plaintiffs and other outside water users according to the terms and at the rates specified in its said resolutions and in the order of the Railroad Commission up to the year 1928. In January of that year, the district fixed a charge of $7.50 per acre-foot to the outside water users, while the charge fixed for water users within the district was $5 per acre-foot. Plaintiffs and the other ouside water users contended that the district could not lawfully charge them a rate for water greater than that charged water users within the district, and that a charge of $7.50 per acre-foot, in so far as the same exceeded the charge to users within the district of $5 per acre-foot, was unlawful.

These actions were thereupon brought, one by plaintiff Henderson, who since 1892 has been a water user and a land owner under the Palermo system, and the other by plaintiff Rutherford, who possessed a water right agreement and has been a water user under the South Feather system since 1913. The fact that there were two public utility water systems serving two different groups of water users made it necessary to bring two actions, one by Henderson acting in a representative capacity in behalf of himself and other outside water users formerly supplied with water from the Palermo system, and the other by Rutherford, acting in a representative capacity on behalf of himself and other outside water users formerly supplied with water from the South Feather system.

The purpose of the two actions, as set forth in said complaints, was to have the court adjudge, declare and determine the rights and duties of plaintiffs and those similarly situated and the duties of the defendant district under the contracts and written instruments by virtue of which the defendant district acquired the two irrigation systems from the former owners. The real issue presented by the pleadings of the parties to this action is whether the district may lawfully impose upon the outside water users a charge for water in excess of that charged by the district

for water supplied to users within the district. The actions were tried by the court, and at the conclusion of the trial the court made findings and entered judgments in favor of the plaintiffs. The court held that the term "charge" as used in the opinion and order of the Railroad Commission authorizing the transfer of the property of said utilities to the district, and as used in the resolutions of the defendant district, referred to and set out in the said opinion and order of the Railroad Commission, meant, "rate to be paid for the use of water". The court accordingly held that the district could not legally charge plaintiffs or other land owners similarly situated a rate for water greater than the rate paid for use of water by members of the district. It further held that the charge of $7.50 per acre-foot to outside users was unlawful to the extent that it exceed $5 per acre-foot, the rate charged for use of water by members of the district, and such excess was in violation of the resolutions of the defendant district and said opinion and order of the Railroad Commission. From these judgments, the defendant has appealed.

No serious contention is made by the district as to the meaning of paragraph "Fourth" of the resolution of the district, setting forth the terms and conditions upon which it would purchase said public utilities. This paragraph reads as follows: "That the above mentioned rates specified in paragraph two hereof shall not be raised after January first, 1928, provided however that should the charge paid for water within the said District exceed the sum of twenty-two cents (22 cts.) per inch, then and in that event the present water users shall pay the same charge as is paid within said district." No point is made by either party hereto that the district could not after January 1, 1928, charge the outside users an amount in excess of $5 per acre-foot, provided the same charge was made to users of water within the district. It is, however, the contention of the district that under all the facts and circumstances brought out by the evidence its power to fix charges for water owned by it and under its control is not restricted or limited in any manner whatever by the resolutions of its board of directors above referred to or by the order of the Railroad Commission authorizing the transfer of the two utility systems, or by any other act, resolution, or

order of said district, or of said Railroad Commission. ▇

It ·claims to possess and hold the water rights and other property transferred to it by the Palermo and South Feather Companies subject only to the dedication of such portions of said irrigation systems to public use as had been made by either of said companies prior to said transfer, and that any ·contractual obligations assumed by it, or any conditions fixed by the Railroad Commission in its order granting authority to make said transfers, beyond the pre-existing dedications, are of no binding effect upon the district and cannot in any manner affect its control and management of the affairs of the district.

▇ In support of this position it first contends that neither the plaintiffs nor any outside water user ever entered into contracts with the district pursuant to the resolutions of its board of directors, and consequently they have no rights against the district beyond those attaching by operation of law under the pre-existing dedications. The provision of said resolution relied upon by the defendant district is as follows: "Whereas in consideration of the present water users withdrawing their said protest, the said Oroville-Wyandotte Irrigation District does agree to enter into contracts with each of said water users accepting this offer as herein set forth within six months from date hereof." It is conceded that no formal or written contracts were ever entered into under this provision of the resolutions. Upon this issue of the case the trial court found in each case as follows: "That plaintiff and other owners of land similarly situated, were within the six months period provided in the resolution of the defendant district, ever since have been, and now are ready, able and willing to execute a contract with defendant upon the terms set forth in said resolution and offered within said period of six months to execute such an agreement, but that defendant then refused and still refuses so to do."

This finding is unquestionably supported by the evidence before us. Some time after the transfer was made the defendant district, through its attorney, prepared a printed form of contract, purporting to conform to the provision of the resolutions above quoted. It contained, however, a radical and material departure from the terms of said resolutions in that it provided that "party of the second

part (the outside water user) shall pay yearly the same total costs for water as is paid within the Oroville-Wyandotte Irrigation District, said total costs to consist of the same rate per inch of water as is paid by landowners within the district, plus the same assessment paid by the landowners of similar land within the district for the year said water is being used''. The plaintiffs and the other outside water users refused to sign the contract as prepared by the defendant, and prepared a form of their own following the precise provision of the resolutions providing for such contracts. This they presented to the attorney for the district and asked that it be accepted and executed by the district. The attorney refused to accept the draft of the contract proposed by the plaintiffs or to have the district sign or execute it or any one similar thereto. The rather technical objection is now made by the district that this draft of the proposed contract of the plaintiffs while presented to the attorney was never formally presented to the board of directors, the body empowered by law to act for the district. The evidence, however, shows that the board of directors had committed the preparation of these contracts to the attorney for the district and that the board of directors was acting under the advice and direction of their attorney in this matter and was fully informed of the negotiations between their attorney and plaintiffs. It is apparent, therefore, that the finding of the trial court that the failure of the parties to enter into said contracts was due to the refusal of the district to execute the same finds ample support in the evidence. The defendant should not, therefore, after its refusal to sign the contracts called for by its own resolutions, be permitted to gain any rights growing out of its said refusal. That the defendant district considered that it was bound by the terms of its resolutions, although no formal contracts had been executed in accordance with their provisions, is shown by its subsequent action in furnishing water to the outside users in accordance with the terms of its resolution for five years and until January 1, 1928. ■ The defendant district having accepted transfers of the two utility systems under the express agreement that it would enter into contracts in conformity with the terms of said resolutions, cannot by its refusal to comply with its agreement after it has acquired

said property, escape the obligations assumed by it in the resolutions under which it agreed to purchase said property. It is bound by this contract as effectively as if it had in accordance with its agreement entered into formal contracts with the outside water users. This is particularly so in the present action, where the obligations thus assumed by the district were those imposed by the Railroad Commission as conditions upon which the Railroad Commission granted authority to the utilities to transfer their properties to the district. The position of the defendant regarding its contract obligations with the outside water users is similar in principle to that of a party to an informal agreement with the understanding that the parties thereto will later execute a more formal contract, and the failure of said party to enter into the formal contract does not release him from his obligation incurred under the informal agreement. "The mere fact that a written lease was in contemplation does not relieve either of the contracting parties from the responsibility of a contract which was already expressed in writing. Where one party refused to execute the lease according to the contract thus made, the other party has a right to fall back on the written propositions as originally made, and the absence of the formal agreement contemplated is not material." (*Levin* v. *Saroff*, 54 Cal. App. 285 [201 Pac. 961, 963].) The defendant district accepted conveyances from the two public utility companies upon the conditions imposed by the Railroad Commission, and expressly agreed that it would enter into written contracts with the outside water users whereby it would obligate itself to perform said conditions. Its subsequent refusal to enter into such contracts with the outside water users did not entitle it to hold the property conveyed to it free from the conditions imposed by the Railroad Commission, and which it had consented to by its said resolutions. In such a case, the outside users may rely upon the agreement of the district as set forth in said resolutions followed by the district's acceptance of conveyance of said property and its later retention and use of said property as its own. If we are correct in this conclusion, then it is apparent that the district holds said property conveyed to it by the two utility companies subject to the pre-existing dedications to public use and safeguarded and protected by the conditions imposed by the Railroad

Commission and accepted by it at the time of the transfer of said utilities. These conditions not only governed the charge which the district might make for water delivered to the outside users, but also the quantity of water which these users were entitled to receive under previous contracts made with their respective companies. These contracts had been in force many years prior to the conveyance of the utilities to the district. The terms set forth therein were made conditions upon which the Railroad Commission granted its authority to make such conveyances, and as the district accepted such conveyances subject to such conditions it cannot now refuse to carry out its contract upon the ground that the contracts were beyond the power of the utility companies to make, or that the district itself exceeded its powers in agreeing to carry out these contracts after its acquisition of the properties from the utilities. In our former opinion in the Henderson case we referred to this matter and there said: "The further contention of respondent seems to be that inasmuch as the railroad commission admittedly is without supervisory power over defendant Irrigation District (citing authorities), and further asserting the passage of such resolution of the district was an act *ultra vires* its powers, the said district thereby acquired the water rights in question without restriction or condition and plaintiff and others in like situation are thereby foreclosed from questioning the unregulated supremacy in the premises of said district. In other words, the contention is that the exemption, weakness and infirmities of the district are now to be claimed elements of strength as against the claims of plaintiff and others. We, of course, are not required to finally dispose of this question and do not do so, but we do not hesitate to say that a water right was in 1892 dedicated to the lands of plaintiff and others in like situation and they have enjoyed such right continuously up to this time, and it is difficult to see how, by any transfer of franchises or property from the utility to the district, these rights can be said to have been destroyed or consumed—rights of which each of the contracting parties admittedly had full notice. (*Byington* v. *Sacramento Valley etc. Co.*, 170 Cal. 124, 130 [148 Pac. 791].)" (*Henderson* v. *Oroville-Wyandotte Irr. Dist.*, 207 Cal. 215, 219 [277 Pac. 487, 488].) Having acquired ownership of the utilities subject to these contracts and having expressly

agreed to carry out the same, the district is now bound by its contract. (*City of San Diego* v. *La Mesa, L. G. & S. V. Irr. Dist.*, 109 Cal. App. 280 [292 Pac. 1082].)

The district further asserts that the Railroad Commission has no jurisdiction over the purchaser of a public utility, and that in a transfer of property of that character its jurisdiction operates solely upon the seller and not upon the buyer. From the foregoing it makes the deduction, if we correctly understand its position, that the purchaser or buyer is not bound by the action of the Railroad Commission fixing the conditions upon which a transfer of public utility property may be consummated. In *Hanlon* v. *Eshleman*, 169 Cal. 200 [146 Pac. 656, 657], this court held, "with the rights of an intending purchaser the commission has nothing to do". That, however, was an action brought by a prospective purchaser against the members of the Railroad Commission in which he sought 'to compel the Railroad Commission by *mandamus* to authorize a sale in accordance with his agreement with the owner of a public utility. Very properly the court held that the prospective purchaser had no standing in such an action. The point decided in that action is very different from that made by the district in this case. While it is true that the purchaser is not in any manner under the jurisdiction of the Railroad Commission, and has no standing in any proceeding instituted before said commission brought for the purpose of authorizing a sale to him, if, after the commission has acted and has fixed the conditions under which it would authorize a sale to him, he then purchases the property under the conditions fixed by the Railroad Commission, we know of no law, and none has been called to our attenton by the district, which would permit the purchaser after acquiring the property to disregard the conditions under which he made his purchase.

Another assertion made by the district is that the sole interest of the Railroad Commission lies in protecting the existing public use, and the contention is then made that any attempt on the part of the Railroad Commission before granting authority to sell a public utility, to enlarge or extend this public use is void as beyond the jurisdiction of the Railroad Commission. Section 51 (a) of the Public Utilities Act requires the consent of the Railroad Commission to the sale and transfer of any public utility. No sale

of property burdened with a public use is legal, or of any validity whatever, unless the authority to make such sale is first given by the Railroad Commission. In approving or authorizing such a sale, the Railroad Commission has jurisdiction to impose such conditions as will in the judgment of the Railroad Commission protect and safeguard the pre-existing rights of those entitled to service under said public utility. (*Glenn-Colusa Irr. Dist.* v. *Paulson*, 75 Cal. App. 57 [242 Pac. 494, 500].) In that case the court expressly held that, "In making its decision relative to the discontinuance of its public utility functions by the West Side Canal Company and the permitting of a transfer of its properties to the Glenn-Colusa Irrigation District, the Railroad Commission was confronted with the fact that the Irrigation District was not a public utility subject to the regulations and control of the Railroad Commission (see *City of Pasadena* v. *Railroad Com.*, 183 Cal. 526 [10 A. L. R. 1425, 192 Pac. 25]), and, therefore, was under the necessity of making its orders conditional, as in that way only could the use of the water for irrigation purposes, as formerly furnished by the Sacramento Valley West Side Canal Company, be insured." The language of this decision is strikingly applicable to the situation before the Railroad Commission when the two utilities, the Palermo and South Feather Companies, petitioned for authority to transfer their properties to the defendant district. After these properties were once conveyed to the district the Railroad Commission lost all authority and jurisdiction over them, including the power to fix rates for the use of water by outside consumers as well as those within the district. The Railroad Commission was, therefore, confronted with the duty of protecting the rights of these outside users after the systems under which they were being served with water had passed out of its jurisdiction. It accordingly imposed the conditions set forth in its order authorizing the sale before it would grant such authority. It may not be said that these conditions enlarge or extend the rights of the outside water users, or add anything to such rights beyond those enjoyed by the outside water users prior to the transfer. The quantity of the water received by them under the conditions imposed by the Railroad Commission was the same as that which they had for years previously been receiving under their public utility

right. As the Railroad Commission would be without authority after the transfer to fix the rates to be charged the outside users, it inserted in its order authorizing the transfer conditions which, if they were not suggested by the district, they were by the district agreed to, would protect in the future the rights of the outside users then existing. We are not called upon to decide whether these conditions imposed by the Railroad Commission resulted in fixing reasonable rates for the use of water by the outside users. The order of the Railroad Commission has become final in that respect and determines that question beyond the power of this court to modify or set aside, at least in a proceeding like that now before us. In view of the fact that the district consented to these rates, in fact, as far as the record before us shows, took the initiative in having them incorporated in the order of the Railroad Commission, it is now in no position to complain that they are unreasonable or that it should not be governed by them in its dealings with the outside water users. We, therefore, conclude upon this branch of the case that the Railroad Commission in safeguarding the rights of the outside users in the manner and to the extent it did by its order authorizing the sale, merely sought to preserve to the outside users their pre-existing rights under the two public utilities. There is nothing to be found either in the case of *Hanlon* v. *Eshleman,* 169 Cal. 200 [146 Pac. 656], or *Baldwin* v. *Railroad Com.,* 206 Cal. 581 [275 Pac. 425, 429], which militates against this conclusion. The former case we have already referred to and stated its purpose and the ruling of the court therein. In the Baldwin case the properties of a privately owned public utility company was by the authority of the Railroad Commission conveyed to a water storage district, organized under the laws of this state. (Stats. 1921, p. 1727, and acts amendatory thereof.) Some of the consumers under the public utility were not included within the storage district and the Railroad Commission in granting permission to transfer the property of the utility imposed certain conditions in its order safeguarding the rights of these outside consumers. In this connection the court said, ''When the commission has safeguarded, as it has in its order authorizing the transfer, the rights of consumers of the canal company outside the district and has provided that the consumers within the district shall

be served as provided in the Storage District Act, it is clear that the commission has properly performed its functions.'' That case instead of holding that the Railroad Commission is without power to exact conditions upon which it would authorize a sale of a public utility, expressly holds that such an exercise of power is a proper function of the commission in order to safeguard the rights of outside consumers.

Finally the district contends that the judgments of the trial court confiscate the properties and systems of the district without due process of law and deny to it the equal protection of the law. The judgments of the trial court simply construe the several instruments and documents under which the district acquired the properties of the two utilities, and declare the rights and duties of the parties thereto under these documents and instruments. They in fact merely construe the contracts under which the district acquired and now holds these properties. The effect of these judgments is that the district is held to its contracts. If there is any confiscation of the property of the district it is due to the contracts which the district made at the time it acquired this property and not to any judgment of the court construing these contracts. In support of this final contention that the judgments of the trial court confiscate the property of the district, the latter refers to certain evidence given at the trial of these actions which shows, or at least tends to show, that the members of the district are paying more for their water than are the outside users. In fact it is contended that the members of the district for less than half of the water available and delivered since the acquisition of the two utilities by this district pay more than two-thirds of the actual cost of furnishing such water to the users. This cost of water to the members of the district, however, includes the revenues from taxes and assessments paid by the members of the district in addition to the acre-foot rate charged all water users. The weak link in the district's argument is that the revenues raised by taxes and assessments are not wholly and perhaps not at all used for the purpose of furnishing and delivering water to the users thereof. On the other hand, it clearly appears from this evidence that these revenues are largely used for the purpose of paying the interest on its bonded indebtedness and other expenses

incurred by the district in extending its water system. The district comprised 24,200 acres, only 2,068 of which were receiving water at the time the district acquired the properties of the two utilities. A portion, the record fails to show just how much, of these 2,068 acres within the district receiving water was under the irrigation system of the two utilities prior to the transfer. There were 2,757 acres outside the district receiving water from these two irrigation systems at the time of the transfer and after the transfer they continued to receive water from the district. As there were over 20,000 acres in the district without water at the time the district acquired the two utilities, it is apparent that in order to carry out its plans it would be necessary to expend very large sums of money in securing additional water rights, constructing canals, ditches and laterals, and purchasing rights of way for the same. As to the advisability of making these extensions in the irrigation system of the district the outside users had no voice and with these plans they were not seriously concerned. They would receive only slight and probably no benefit from the large expenditures of money necessary to perfect an irrigation system adequate to the needs of the whole district. It was this burden—this large expense which would be necessary if the district carried out its plans to supply all of the lands of the district with water—that the outside users sought to protect themselves against when it was proposed that the district acquire the properties of the Palermo and South Feather Companies. In the light of these facts we think it may well be doubted whether the members of the district are actually paying more for their water service than those outside the district. At the time of the organization of the district it is apparent that there was considerable diversity of opinion among the land owners residing in the locality where the district was subsequently organized as to whether it was advisable to organize the district, and as to the advisability of having their lands included in the district. The result was, as we have already seen, that the plaintiffs and those whom they represent remained out of the district. Those who consented to become members and have their lands included in the district, it may well be assumed, knew of the plans of the organizers of the district to include therein a large body of land without water with the object and purpose of

acquiring additional water rights which might be brought upon and used upon these heretofore nonirrigated lands. With this knowledge they became members of the district and thereafter the district began to carry out the plans of developing a water system sufficient in capacity to irrigate as far as possible all of the lands in the district. These members of the district are of course liable for the expense thus incurred. They stand in an entirely different position from the plaintiffs who decided to remain out of the district and to receive water from the district under the plan outlined above. That those in the district are compelled to meet higher charges for water they receive than the outside users is not surprising. In fact, it must have been contemplated by them that such would be the result if they became members of the district, and the district should put into execution the plan of extending its water system to all the irrigable lands in the district. The fact that the members of the district under these circumstances are required to pay higher charges for the water used than the outside users does not to any extent amount to a confiscation of the property of the district. The two classes of water users stand in entirely different positions regarding their respective rights to have water supplied to them by the district. There is in our opinion no merit in the contention of the district that the judgments herein confiscate the plants or property of the district.

From a review of the record in the two cases we are satisfied with the construction placed by the trial court upon written instruments and other documents by which the transfer was consummated of the two public utilities from the Palermo and South Feather Companies to the defendant district, and furthermore, that the trial court in its judgments in these actions correctly determined and declared the rights and duties of the parties hereto under said written instruments and documents.

The judgments are affirmed.

Langdon, J., Preston, J., Seawell, J., and Waste, C. J., concurred.

Rehearing denied.

Shenk, J., dissented.