[Civ. No. 14163. Third Dist. July 18, 1975.]

WYANDOTTE ORCHARDS, INC., Plaintiff and Respondent, v.
OROVILLE-WYANDOTTE IRRIGATION DISTRICT,
Defendant and Appellant

## COUNSEL

Rich, Fuidge, Dawson, Marsh, Morris, Sanbrook, Grove, Hill & Iverson, John S. Sanbrook and Charles C. Dawson, Jr., for Plaintiff and Respondent.

Minasian, Minasian, Minasian & Spruance, Minasian, Minasian, Minasian, Spruance & Baber and William H. Spruance for Defendant and Appellant.

## Opinion

**FRIEDMAN, J.**—Plaintiff Wyandotte Orchards, Inc., brought this declaratory relief action against the Oroville-Wyandotte Irrigation District, claiming contractual entitlement to one-quarter of a miner's inch of water annually for each acre of its 166½-acre parcel. The parcel lies outside the district boundaries. The district contended that plaintiff was entitled to one-quarter inch for each of the 146 acres which plaintiff had developed by December 1932, with no entitlement for the 20½ acres which plaintiff had not developed by that date. The trial court sustained plaintiff's claim to water calculated by the measure of the entire 166½ acre parcel.

The underlying transactions giving rise to the suit occurred between 1912 and 1922. Some of them have been litigated earlier. (See *Henderson v. Oroville-Wyandotte Irr. Dist.* (1929) 207 Cal. 215 [277 P. 487]; *Dankert v. Oroville-Wyandotte Irr. Dist.* (1930) 211 Cal. 87 [293 P. 785]; *Henderson v. Oroville-Wyandotte Irr. Dist.* (1931) 213 Cal. 514 [2 P.2d 803]; *Rutherford v. Oroville-Wyandotte Irr. Dist.* (1932) 215 Cal. 124 [8 P.2d 836]; *Rutherford v. Oroville-Wyandotte Irr. Dist.* (1932) 218 Cal. 242 [22 P.2d 505].)

For a number of years prior to 1922, two small land and water companies operated in the general area now served by defendant; they were the Palermo Land and Water Company ("Palermo") and the South Feather Land and Water Company ("South Feather"). In 1912, South Feather and the then owner of plaintiff's parcel executed a water supply agreement. The quantity to be supplied was 25 California miner's inches, continuous flow annually. Plaintiff acquired the 166½-acre parcel sometime prior to 1917. Similar contracts were executed between South Feather and other landowners in the area. Palermo also executed water supply contracts with its consumers.

In 1922 the California Railroad Commission (now Public Utilities Commission) was asked to approve arrangements by which the newly formed Oroville-Wyandotte Irrigation District would take over the water services of the two companies. A protest was filed by landowners whose lands were outside the boundaries of the new district. These owners, having received water service from the two companies, feared that they would be left without adequate protection as to future flow and rates. There followed a series of meetings among representatives of the

Railroad Commission, the two water companies, the new irrigation district and the protesting landowners. These meetings resulted in an understanding which induced the landowners who were "present water users" to withdraw their protests. The understanding was embodied in two resolutions adopted by the board of the irrigation district, one for each company. According to these resolutions the district undertook to supply the "present water users" with one inch of water for each four acres of land. We quote in the margin three passages from the resolution relative to South Feather customers.[1]

With these resolutions before it, the Railroad Commission on December 8, 1922, adopted an order approving the application for transfer and reciting: "That the present water users of the two water companies parties hereto, and those persons or firms desiring to become water users within ten (10) years from the date hereof, shall receive service from the Oroville-Wyandotte Irrigation District at the rates and under the conditions recited in [the applications]" for transfer and in the two resolutions of the irrigation district board.

Defendant contends that plaintiff was not a "present water user" as to plaintiff's unirrigated acreage of 1922; that under the terms of the governing documents plaintiff was required to develop this unirrigated acreage by December 8, 1932 (10 years from the date of the Railroad Commission order); that plaintiff had developed only 146 acres by that date, hence it is not entitled to a flow measured by its 20½ unirrigated acres.

The resolutions of the irrigation district, as confirmed by the Railroad Commission's order, form a contract between the irrigation district and

---

[1] " '[T]he term "present water users" is hereby declared to mean the owners, their heirs, successors, grantees and assigns of lands supplied with water from the water system of the [South Feather Land and Water Company] and which lands are not now in the Oroville-Wyandotte Irrigation District.

" ' . . . . . . . . . . . .

" '[Said] water users, and each of them shall be entitled to and shall receive one (1) inch of water, continuous flow, for every four (4) acres of land. The amount of water now supplied to said water users shall continue to be so supplied by said Irrigation District and shall be part of the said one (1) inch of water for every four (4) acres of land, and the additional water necessary to make one inch of water continuous flow for every four (4) acres of land shall be available to said water users from the first water developed by the said District.

" ' . . . . . . . . . . . .

" 'All the existing rights of the present water users shall continue and this agreement is an addition to all the rights and benefits they now possess.' "

those customers of the two former utilities whose lands lay outside the district; by accepting the transfer under the conditions imposed by the Railroad Commission, the irrigation district became bound by those conditions. (*Henderson* v. *Oroville-Wyandotte Irr. Dist., supra,* 213 Cal. at pp. 526-528; *Rutherford* v. *Oroville-Wyandotte Irr. Dist., supra,* 218 Cal. at pp. 244-245.) The present appeal requires interpretation of the contractual phrase "present water users." There is no conflict in the extrinsic evidence bearing on the meaning of the phrase; thus the appellate court must make an independent determination. (*U.S. Leasing Corp.* v. *duPont* (1968) 69 Cal.2d 275, 284, 290 [70 Cal.Rptr. 393, 444 P.2d 65].) ■ We have concluded that the trial court correctly construed the contract and properly rejected defendant's interpretation.

We construe the phrase "present water user" as an identification of the 1922 water customers without differentiation between the developed and undeveloped portions of any customer's individual parcel. Neither in the definition of the phrase (as set forth in the resolutions of the irrigation district) nor in the text of the resolutions and Railroad Commission order is there any language which expressly or impliedly restricts the phrase to less than a customer's entire parcel.

The district attempts to draw such a restriction. First it points to a clause in the 1912 water supply contracts between South Feather and its customers, requiring that within five years of the contract date the full amount of water entitlement "shall be put to use and paid for by the consumer." Second, the district points to a clause in its 1922 resolution defining present water users as owners of *land supplied by water from the water system* of the water companies. It argues that the undeveloped land of an owner was not supplied with water, hence—as to that land—the owner was outside the scope of the definition.

Such a restriction finds no basis in the governing contracts. When plaintiff's predecessor contracted for water in 1912, he became entitled to 25 miner's inches annually. The 1912 contract did not tell him where to put the 25 inches. He could use it anywhere on his tract, for land already developed or for land to be developed in the future. The entitlement conferred by the 1912 contract was not reduced or qualified by the 1922 contract, for the latter—in the form of the irrigation district resolutions—expressly provided for the continuation of existing rights. (See fn. 1, *ante,* p. 984.)

Defendant has taken out of context the clause of the 1912 contract which requires all water to be put to use and paid for within five years. The clause in question is part of an addendum to the 1912 contract. The addendum established a rate of $36.50 per inch for all water actually used and an annual stand-by charge of $1 for each acre upon which no water was used. A correlative provision was the clause requiring the consumer to put to use and pay for his entire entitlement within five years. The latter clause was designed to supersede the stand-by charge and to require the customer to pay for his full contractual entitlement. On what part of his acreage the customer placed the water was outside the contractual ken.

Our interpretation does not destroy the *raison d'etre* of the 10-year limitation in the Railroad Commission order. The commission conditioned its approval by demanding water entitlement for two distinct categories of contract holders: (1) Those contract holders who were present water users and (2) those contract holders who would become water users within 10 years. In 1917 the Supreme Court had considered the situation of persons who had bought parcels from Palermo but had not yet improved their lands or bought water. The court held that these customers did not forfeit their rights by nonuser and could demand water whenever they were ready to use it. (*Palermo L. & W. Co.* v. *Railroad Commission* (1916) 173 Cal. 380, 385-387 [160 P. 228].) When, in 1922, the Railroad Commission faced up to the unused water rights of some of Palermo's land buyers, it decided to impose a 10-year limitation upon their eligibility for water.[2] The 10-year limitation was irrelevant to the rights of landowners who were "present water users" of South Feather in 1922.

Defendant complains of the interpretation sought by plaintiff because, as the trial court found, its distribution system will be inadequate at times to satisfy all demands. ■ Contracts should receive a reasonable interpretation and one which effectuates the parties' purposes as

---

[2]At this point, the Railroad Commission's decision declares: "The question was raised as to the status of the lands that were entitled to water because of contracts entered into at the time of their purchase from the Palermo Land and Water Company, but for various reasons have not as yet received water service. The district took the position that it assumed the obligations of the Palermo system as set out in the deed of transfer, but that it could not properly hold water for these lands indefinitely and would therefore limit the period of final development and delivery of water to these lands to ten years from the date of taking over the system. Only one land owner appeared to protest this limitation, and while he did not withdraw the protest, he admitted that the ten years' limitation appeared to be fair."

discerned from the entire agreement; the courts cannot rewrite a contract to avoid difficulty or hardship. (*Addiego* v. *Hill* (1965) 238 Cal.App.2d 842, 846 [48 Cal.Rptr. 240].)

Judgment affirmed.

Puglia, P. J., concurred.

**PARAS, J.**—I dissent.

Where "present water users" are by definition owners of "land supplied with water," it is axiomatic that they are not owners of "land *not* supplied with water." Yet that is precisely what the majority has held. Land is not "supplied" with water when no water is physically deposited upon or within it; and this simple reality does not change because such land is owned by one who also owns adjoining land which is supplied with water.

During the years 1918, 1919, and 1920, South Feather was unable to meet its contractual commitments to its consumers and was ordered by the Railroad Commission (now Public Utilities Commission) not to deliver water to lands other than those then served, and not to extend service to new consumers until an adequate supply of water was available. During approximately the same period there were also certain lands in the Palermo system which were entitled to water from that company, but for various reasons had not yet received it.

Defendant was organized to serve the area in 1919, and thereafter negotiated the acquisition of the water rights and irrigation systems of Palermo and South Feather. The applications of the two companies for approval of the transfers were filed simultaneously and consolidated for consideration before the Railroad Commission. A protest was filed by landowners who, *although invited to do so,* refused to join the district; and who therefore felt in need of some guarantees as to future rates to be charged for water and services.

Negotiations resulted in the withdrawal of the protest upon presentation to the commission of two identical resolutions of the board of directors of the district, each providing for a future supply of one-quarter miner's inch per acre to the "present water users" of Palermo and South

Feather respectively.[1] The commission then approved the transfer by order dated December 8, 1922 (hereinafter the "order").

Among the matters recited in the order was the subject of undeveloped lands entitled contractually to water but which had not yet received it. The recitation is quoted in footnote 2 of the majority opinion. Thereafter the order dispositively provided: "That the present water users of the two water companies, parties hereto, and those persons or firms desiring to become water users within ten (10) years from the date hereof, shall receive service from the Oroville-Wyandotte Irrigation District at the rates and under the conditions recited in Application 8000 [Palermo] and Application 8018 [South Feather] and in the resolutions of the directors of the Oroville-Wyandotte Irrigation District dated October 20, 1922, submitted and marked as Exhibit 4 in Application No. 8000 and Exhibit 5 in Application No. 8018."

At the time of the order a large portion of plaintiff's 166½-acre parcel consisted of undeveloped land. Plaintiff developed additional acreage on the parcel up to December 8, 1932, the 10-year cut-off date; the total developed by then was .146 acres. Significantly, not a single acre of the remaining 20½ acres was developed in the next 40 years; but in 1972, motivated by the desire to develop them, plaintiff filed this action seeking to establish water rights based on the entire 166½ acres.

The majority concludes that if any part of the 166½ acres was receiving water in 1922, the entire parcel was "supplied with water" in 1922. The original contract of 1912 unequivocally deals with a fixed supply of water (25 inches) to the 166½-acre parcel as a whole, developed or undeveloped;[2] This is a ratio of 1 inch per 6.66 acres. That the contract recognized the then existing lack of development of some of the acreage is made clear by the unrecorded addendum thereto providing for a standby charge of $1 per acre on land "upon which no water is used." This addendum also provided that "For *all water used,* the regular charge of $36.50 per inch, as provided in [the] contract shall be paid" (italics added); it further provided that within five years (from Jan. 4, 1912) "all water provided for . . . shall be put to use and paid for by the

---

[1] It is to be noted that this 1 inch for every 4 acres is substantially more than the 1 inch for every 6.66 acres (25 inches per 166½ acres) called for by the 1912 contract.

[2] The contract provides for the sale and purchase of "twenty-five (25) miners inches continuous flow of water per year for . . . use upon the lands . . . described as . . . about 166½ acres."

consumer." Thus we observe that although plaintiff (or its predecessor) was *entitled* to a full 25 inches of water for all the acreage, for the first five years after January 4, 1912, the parcel would be charged only for the water actually used (presumably on a pro-rata acreage basis). The record is silent as to whether all water was in fact paid for after the first five years, although we may infer from the fact that substantial acreage was not developed in 1922 that it probably was not. Be that as it may, the importance of the addendum is its recognition of the distinction between acreage actually using water and acreage entitled to use water but not in fact using it.

In this setting the 1922 order was made, amending the original contract. In defining the term "present water users" it uses the term "land supplied with water." While this latter term could refer to all land described in any contract for the sale and purchase of water, more reasonably (and especially to these contracting parties in the light of the background of the 1912 contract and addendum) it referred to acreage actually receiving water. Acreage entitled to water but not under cultivation and hence not irrigated, is not "land *supplied* with water."

"A contract must receive such an interpretation as will make it lawful, operative, definite, *reasonable,* and capable of being carried into effect, if it can be done without violating the intention of the parties." (Italics added.) (Civ. Code, § 1643; see also 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 528, p. 450 et seq.; 14 Cal.Jur.3d, Contracts, § 156, p. 398.) For a number of very obvious reasons the interpretation of the majority is unreasonable. To require defendant to hold water in reserve for an untold number of years (in this case 40 -1932 to 1972; it could just as well have been several centuries) awaiting plaintiff's decision (or indecision) to develop its hitherto unused acreage would be unreasonable; it also hints of a perpetuity (Civ. Code, § 715.2). Such a result causes me to ask what purpose the 10-year limitation then served. The majority answers that the 10-year limitation applies only to those contract holders who did not receive *any* water for *any* of the acreage included in their contracts, not to plaintiff (or others) who received *some* water for *some* of its acreage.[3] This position is untenable; such an artificial distinction is unreasonable. I am convinced that had plaintiff's officers been asked in 1922 whether there was any time limitation to their corporation's right to

---

[3]The majority states that its interpretation does not destroy the *raison d'etre* of the 10-year limitation in the Railroad Commission order. If it hasn't destroyed it, it has certainly emasculated it.

water for undeveloped acreage, they would have promptly answered in the affirmative. I am equally convinced that if the same question had been put to them in 1932 (some of the 1922 officers might well have still been there in 1932), they would have acknowledged that the undeveloped lands had no right to water.

The majority's interpretation is both impractical and potentially unfair. Under it, an owner of 100 acres with a contract identical to that of plaintiff and who farmed none of it in 1922 would have to develop acreage within 10 years or proportionately forfeit his right to water. But the owner of an adjoining 100 acres with the same contract, who farmed a single acre only in 1922 and that same acre in 1932, not only did not lose the right to water for his remaining 99 acres in 1932, but has not lost it yet and will not have lost it in the year 3000. This result is absurd.

The final and most telling argument against the majority's holding, which the majority has chosen to ignore, is based upon a fundamental rule of interpretation of contracts. The construction which by their actions the parties themselves place upon a contract prior to any controversy is of the utmost importance in ascertaining their intent; no one knows the true understanding of the parties better than they do themselves, and their actions generally reflect it. (*Universal Sales Corp.* v. *Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 761 [128 P.2d 665]; 1 Witkin, Summary of Cal. Law, *supra,* Contracts, § 527, p. 449; Rest., Contracts, § 235, subd. (e).) In this case, how much water was actually used by plaintiff pursuant to the contract between 1932 and 1972? The record discloses that throughout this 40-year period, not over 36½ miner's inches were ever used[4] (1 inch for every 4 acres out of the 146 acres developed by 1932). But if the majority's interpretation is correct, throughout this 40-year period, plaintiff was entitled to 41¼ miner's inches (¼ of 166½ acres). From the fact that plaintiff only had 146 acres under cultivation, it does not follow that plaintiff never in 40 years needed or could have used more than one-quarter inch per acre on such 146 acres. Being entitled to an additional 4¾ inches throughout this time, one would think that at some time plaintiff would seek it or at least assert its right to it. Yet plaintiff did not show a single instance of demand for more than 36½ inches or any complaint because of that limitation. Even if it be conceded that plaintiff did not seek the additional 4¾ inches because they were never needed, if plaintiff truly believed that it had a

---

[4]Obviously, for if any more than this had been used, the present controversy could not possibly have existed.

right to them, at some time over the course of 40 years plaintiff would have engaged in some conduct assertive of that right. Yet plaintiff (having the burden of proof) produced no evidence to this effect; in fact, all its evidence was to the contrary and showed plaintiff's acquiescence in a totally inconsistent interpretation. This is because in truth, plaintiff and defendant both knew that after 1932 there was no contractual right to more than 36½ inches of water.

Further applying the Restatement section 235(e) standard for interpretation of contracts, it is curious that although 23 acres were developed between 1922 and 1932, not another acre was developed or sought to be developed before 1972. Thus again for 40 years, plaintiff did not feel that it had a contractual right to more water than it was receiving, because in fact such right did not exist.

I would reverse the judgment.

A petition for a rehearing was denied August 12, 1975. Paras, J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied September 24, 1975.