[Civ. No. 444. Fourth Appellate District.—October 31, 1930.]

THE CITY OF SAN DIEGO (a Municipal Corporation), Respondent, v. LA MESA LEMON GROVE AND SPRING VALLEY IRRIGATION DISTRICT et al., Appellants.

Stearns, Luce & Forward for Appellants.

M. W. Conkling, City Attorney, and C. L. Byers, Assistant City Attorney, for Respondent.

BARNARD, J.—This is an appeal from an order and judgment restraining the defendant Irrigation District from discontinuing or shutting off a supply of water, and from raising the rate of the service of such water until such time

as such action should be authorized, either by the Railroad Commission of the state of California or by the City of San Diego. The action was submitted to the trial court upon stipulated facts, which were adopted by the court as its findings. The agreed facts may be briefly stated as follows:

For some time prior to April 5, 1924, the Cuyamaca Water Company was a public utility engaged in impounding and distributing water for domestic use and irrigation purposes over a considerable area in San Diego County. On April 5, 1924, the Cuyamaca Water Company gave to the La Mesa, Lemon Grove and Spring Valley Irrigation District an option to buy, in consideration of $1,100,000, its entire system with the exception of a portion which was to remain outside of the Irrigation District, in which area the public utility was to continue to serve the consumers and as to which territory the option contained the following provision:

"It is understood that for East San Diego, Normal Heights and Kensington Park territory now being furnished with water by the Cuyamaca System, the district will continue to furnish water to us through a master meter at the east line of the East San Diego city limits, the price of said water to be nine (9) cents per hundred cubic feet until such time as this rate may be changed by competent authority; and further we agree not to ask for a rehearing or rerating for a period of three (3) years from date."

On June 13, 1925, a written agreement was entered into by which the Irrigation District agreed to purchase from the water company the properties described in the option, upon the terms therein set forth, subject, however, to the consent of the Railroad Commission of the state of California. On June 15, 1925, the Railroad Commission authorized the sale, its opinion and order reciting that the officials of the Irrigation District had represented that it was the intention and desire of the district to "assume all of the service obligations of the Cuyamaca Water Company"; and the order was made subject to the condition that the consideration paid should not later be urged as a finding as to the value of the property for the purpose of rate fixing before the commission, "or any other public body". The order was also contingent upon the Irrigation District filing with the commission its agreement to serve an adequate supply of water to all the present consumers of the Cuyamaca Water Com-

pany, outside the boundaries of said district, except such consumers as under the terms of the option were to continue to be served by the water company itself. Thereafter, the Irrigation District passed such a resolution and filed the same with the commission, following which the actual transfer was consummated by deed. Later, the City of East San Diego, Normal Heights and portions of Kensington Park were annexed to the City of San Diego, and thereafter, on September 27, 1926, the Cuyamaca Water Company gave to the City of San Diego a lease, with an exclusive option to purchase for $150,000, covering that part of their system which had been reserved by them in the sale of the Irrigation District. On January 26, 1927, the Railroad Commission approved transfer from the water company to the City of San Diego. Thereafter, the district continued to furnish to the city such water for distribution in East San Diego, Normal Heights and Kensington Park at the nine-cent rate until March 1, 1929, at which time the district notified the city that the rate thereafter would be increased to twenty-five cents per hundred cubic feet for the first thousand cubic feet, and fifteen cents per hundred cubic feet for all additional water. Upon the refusal of the City of San Diego to pay bills rendered at this higher rate a notice was served that unless the bills were paid the water would be shut off. This action followed. It is stipulated that at all times herein involved the Cuyamaca Water Company was a public utility engaged in the business of supplying, selling and distributing water appropriated, dedicated and impressed with a public use to the consumers entitled thereto for domestic, agricultural and municipal purposes.

■ Appellants argue first that, under the circumstances existing, the Irrigation District has become the "competent authority" referred to in the option and contract. It is argued that while the Railroad Commission was such competent authority so long as the public utility continued to be the purchaser of the water, when the contract was assigned by the public utility to the City of San Diego, the Railroad Commission lost its authority; that the city then became the purchaser of water from the district on the same basis as any private individual, and that under the provisions of the Constitution and the California Irrigation District Act, the Irrigation District then became the com-

petent authority referred to, with full power to fix the rates for such water. We are unable to agree with this contention. While the Railroad Commission originally had control over the public utility, and while it continued to have control over the rates that this utility should charge its consumers, it had no control over the Irrigation District. (*Glenn-Colusa Irr. Dist.* v. *Paulsen*, 75 Cal. App. 57 [242 Pac. 494]; *Water Users Assn.* v. *Railroad Commission*, 188 Cal. 437 [205 Pac. 682]; *Henderson* v. *Oroville-Wyandotte Irr. Dist.*, 207 Cal. 215 [277 Pac. 487].) The only way the Railroad Commission could have exercised control over this rate would have been indirectly by refusing to permit the utility to sell its system to the Irrigation District, except upon conditions that would have covered these rates. (*City of Pasadena* v. *Railroad Com.*, 183 Cal. 526 [10 A. L. R. 1425, 192 Pac. 25]; *Glenn-Colusa Irr. Dist.* v. *Paulsen, supra.*) No such conditions were inserted in their order approving this sale from the public utility to the Irrigation District. ▮ The Railroad Commission neither had authority over this rate during the time the utility continued to receive water from the district, nor do we think any change in the authority to fix the rate was worked by the sale from the utility to the city. The City of San Diego, as such, would not have authority to fix the purchase price of water thus being purchased in bulk for distribution to individual consumers. (*Marin Water etc. Co.* v. *Town of Sausalito*, 168 Cal. 587 [143 Pac. 767, 772].) Nor do we think the Irrigation District either possessed or acquired by this transfer an authority not possessed by the other party to the contract to change the rate at will. The contract remained the same and the transfer to the city was expressly approved and consented to by the Irrigation District. In fact, the district appears to have received an additional benefit through the transfer, having stipulated in its consent thereto for a limitation on the amount of water to be furnished, which does not previously appear in the written agreements.

▮ Appellants rely upon section 13 of article XI of the Constitution and upon sections 55, 61b, 15, 15c, 18 and 39f of the California Irrigation District Act, as giving to an irrigation district the right to fix rates in such a case as the one before us. Without quoting these various sections, we may observe that while authority is given to irrigation dis-

tricts to fix rates within their boundaries, and for surplus water sold to outsiders, it is also to be noted that such a district is given rather broad powers in reference to making and entering into agreements with other individuals and corporations, both public and private, for the purpose of acquiring for the district water rights and water systems. We find neither in these sections nor elsewhere any specific authority given to an irrigation district to fix or establish rates for water sold or delivered outside its own boundaries, in disregard of or irrespective of such a contract as we now have under consideration under which a district has acquired practically an entire system upon the condition of continuing to furnish water for the benefit of ultimate consumers in a portion of the territory theretofore served by the water system thus acquired. Such water is in no sense of the word surplus water. (*South Pasadena* v. *Pasadena Land etc. Co.,* 152 Cal. 579 [93 Pac. 490, 496].) ■ As was said in the case of *Marin Water Co.* v. *Town of Sausalito, supra:* "No case has been presented holding that a municipal corporation may vary the terms of its own solemn contract, under the guise of rate regulation." We think the same applies to an irrigation district. In the same case Mr. Justice Shaw, in a concurring opinion, points out that even where a company has the right to fix its own rate, an agreement for the sale of its water upon such a rate is binding upon both parties, at least until a different rate is fixed by some proper authority. While an irrigation district is given authority by the Constitution and the Irrigation District Act to contract for and to acquire an existing water system, and while with the consent of the Railroad Commission it may even acquire such a system from a public utility, on the other hand, when a district has made such a contract it has no inherent power in itself to change the terms thereof. In support of their contention that in the absence of any regulation by an authorized rate-fixing body, the rate for this water could be fixed by the irrigation district itself, appellants quote from *Henrici* v. *South Feather Land etc. Co.,* 177 Cal. 442 [170 Pac. 1135, 1137], as follows: "Under the law, the water might have been furnished under rates fixed by public authority. In the absence of any such regulation (and there has been none during the period here involved), the service might have been rendered either on rates fixed by the

corporation, or on terms agreed upon by it with the customer.''

■ While the fixing of the rate we are considering might have been left to the Irrigation District, it was, in fact, fixed by an agreement between the district and its customer. We are unable to see that the situation, as thus established, was changed by operation of law by the later transfer of this agreement from the public utility to the City of San Diego, especially in view of the fact that this transfer was consented to by the district with full knowledge of the facts. (*Henderson* v. *Oroville-Wyandotte Irr. Dist., supra.*) In the absence of any competent authority to change the rate as contemplated in the agreement, the terms of the contract would continue binding upon the parties until such time as the same was changed by mutual consent, or until such time as such competent authority should be created by law. We think, therefore, that the relationship between the parties hereto is purely contractual, and that the appellant Irrigation District did not become, by operation of law, the ''competent authority'' referred to in the option.

■ The second contention of appellants is that under the terms of the option of April 5, 1924, as later embodied in the contract under which they acquired the water system, their obligation to furnish water to these districts ceased at the end of three years. Their contention is that it was optional with the district whether it would continue to furnish water after that time, and, therefore, that any water so furnished was exactly like any surplus water sold by the district to any individual outside its boundaries, with the corresponding right in the district to fix the price thereof. Their argument is that this was merely a contract to sell a commodity, water in bulk, that no easement or servitude was involved, and that a contract for the sale of a commodity, which is silent as to its duration, may be terminated after a reasonable time by either party. In support of this, they cite the case of *Southern Pac. Co.* v. *Spring Valley W. Co.*, 173 Cal. 291 [L. R. A. 1917E, 680, 159 Pac. 865]. As pointed out by the court in that case, such a principle, although discussed therein, does not apply where the parties are dealing in water, subject to the rights of others in its continued use. In this case the contract was entered into with knowledge of, and with a consideration of, the rights of

the water users in the communities named, and the Irrigation District is bound thereby. (*Henrici* v. *South Feather Land etc. Co., supra; Henderson* v. *Oroville-Wyandotte Irr. Dist., supra.*) The Irrigation District definitely agreed to "continue to furnish water" to the utility, "for East San Diego, Normal Heights and Kensington Park territory now being furnished with water by the Cuyamaca System", and assented to the transfer of this agreement to the city.

Under these circumstances, the Irrigation District accepted the obligation and duty of delivering water, first to the Cuyamaca Water Company and later to the City of San Diego, for the purpose of distribution to the inhabitants of these particular communities. Having accepted such obligation and duty in consideration of other benefits accruing to the district, it must be held that the very considerable system acquired by the district from the water company, was acquired subject to the burden of continuing the service in question. The water in question was water theretofore dedicated to the use of the people of these districts, and was not such surplus water as the district may sell at its pleasure. In reference to a somewhat similar situation, the Supreme Court says in the case of *South Pasadena* v. *Pasadena Land etc. Co., supra:* "In truth, however, the city will not be selling its surplus in the sense intended by the statute. The right to the use of the required quantity of this water is now vested in the city of South Pasadena and its inhabitants within the portion of its territory where it is to be served, and the city of Pasadena does not propose to take away this right. It is about to buy only the right of the Pasadena Land and Water Company to the water, which did not include the use. It will be obliged to put it to the same use as fully as that company is now compelled to do. Water which is in this manner dedicated to the use of an outside community cannot be at the same time surplus water subject to sale to others. The sale is already, in effect, accomplished. The city of Pasadena, with respect to this part of the water, will hold title as a mere trustee, bound to apply it to the use of those beneficially interested."

To the same effect, see *East Bay Mun. Dist.* v. *Railroad Com.,* 194 Cal. 603 [229 Pac. 949]. In *Fellows* v. *City of Los Angeles,* 151 Cal. 52 [90 Pac. 137], it was held that although a city may purchase an entire water system and

water supply with the avowed object of securing the surplus water, it cannot continue to hold and control such property as has been appropriated to public use and at the same time refuse to perform the public duty imposed upon it by possession, and it must continue to furnish water to those entitled thereto. (See, also, *La Mesa etc. District* v. *Halley*, 197 Cal. 50 [239 Pac. 719]; *Henderson* v. *Oroville-Wyandotte Irr. Dist., supra.*) In *Hewitt* v. *San Jacinto etc. Irr. Dist.*, 124 Cal. 186 [56 Pac. 893], a water company had transferred its system to an irrigation district, with the exception of the right to the delivery of certain water previously granted to others, including the plaintiff. In speaking of the relation of the Irrigation District to the rights of the plaintiff, the court said: "It purchased the property of the water company subject to this burden and on no just principle can hold the property discharged thereof." Not only was this obligation a continuing one, but under the terms of the agreement under which the appellant acquired all its rights, the obligation was to continue to furnish water at the same rate until such time as this rate should be superseded by the order of some public agency, upon which had been conferred power sufficient for that purpose. In the case of *Henrici* v. *South Feather Land etc. Co., supra,* the plaintiff had a contract for the purchase of water at a certain price, with a corporation which was engaged in the business of furnishing and supplying water to the public for hire, which contract did not specify how long the obligation should continue. That corporation transferred its property to another public service corporation which undertook to change the rate. In reference thereto the court said: "The obligation to furnish water at the agreed rate was unlimited in time, and continued until the rate was superseded by a public body vested with the power to regulate the service."

Not only have the rights of these parties, as fixed by contract, not been changed by operation of law, but in our opinion that clause of this contract providing for the delivery of water at the rate agreed upon "until such time as this rate may be changed by competent authority," does not contemplate that the "competent authority" referred to shall be the Irrigation District. "A contract must be so interpreted as to give effect to the mutual intention of the

parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, sec. 1636.) In *Palermo L. & W. Co.* v. *Railroad Com.,* 173 Cal. 380 [160 Pac. 228, 229], it was held that a provision in a contract that water was to be supplied "at such rates as may be fixed by law in the district in which said lands are situated", contemplated that the rate should be fixed by public authority. The words used here, "until such time as this rate may be changed by competent authority", show an intention that any change in the rate shall be made only by some public agency specifically authorized by law to regulate such charges. The language used seems to us to negative the idea that the seller or party collecting the charges is, or could 'be, the authority intended. To hold otherwise, makes the clause meaningless. ▉ A contract should be so construed as to give force and effect to every part of it. (Civ. Code, sec. 1641.) In the same sentence the party who is to pay the rate fixed, agrees not to ask for a "rehearing or rerating" for a period of three years. This party had theretofore been subject to the regulation of the Railroad Commission, and while allowance was thus made for the fact that this regulation would cease, in so far as this rate was concerned, and for possible future changes in the law as affecting the rate-fixing authority it is apparent that the very thing the utility was trying to do was to protect itself from such an arbitrary raise in rates by the Irrigation District as is now attempted. And to this protection the other party agreed.

If there be doubt as to the meaning of words used in a contract, the court may look to the understanding which was given to them and acted upon by both parties. (*D. Ghirardelli & Co.* v. *Students' E. & F. Co.,* 175 Cal. 427 [166 Pac. 16].) Some light may here be obtained from this source. It appears that the Railroad Commission withheld for a time its approval of this transfer from the water company to the Irrigation District in the hope that a compromise which had been suggested by the Railroad Commission could be arrived at between the Irrigation District and the City of San Diego in reference to their conflicting claims to water from the San Diego River. In a supplemental agreement dated June 13, 1925, between the water company and the Irrigation District such a compromise is referred to at

length, and it is therein agreed that in the event the Irrigation District should be able to make such a satisfactory settlement with the City of San Diego, including an arrangement by which the City of San Diego should purchase from the water company its distribution system covering East San Diego, Normal Heights and Kensington Park, then and in that event the water company "will waive and relinquish the right given it and contained in said option to purchase water from said Cuyamaca system, after the consummation and carrying out of this contract of purchase and sale, at the rate of nine (9) cents per hundred cubic feet, and will waive and relinquish all right to purchase any water for supplying said above mentioned territories". In a later agreement between the same parties, dated December, 1925, this provision in the supplemental agreement of June 13, 1925, is stricken out, the compromise not having been effected. It seems reasonable to suppose that had such a compromise gone through the Irrigation District would have given up something of value in consideration for the benefit thus obtained. In any event, it is apparent from this action that the Irrigation District recognized a definite obligation to furnish water for distribution in those particular territories at the rate named, and that the obligation was one from which they desired to escape.

Again, in the agreement of September 27, 1926, under which the water company leased the remainder of its system to the City of San Diego with an exclusive option to purchase the same, the contract to purchase water at the nine-cent rate contained in the original option is copied *verbatim*, with the statement that while a number of modifications and extensions of time were subsequently executed, none of said modifications "in any shape, manner or form" changed "the obligation of the district to furnish to the lessors herein water at nine (9) cents per hundred cubic feet as above set forth"; and then appears the following: "Whereas, said obligation to so furnish said water now so rests upon said district; and

"Whereas, said district consents to the transfer of said contract to so furnish water by said Cuyamaca Water Company to The City of San Diego, as is shown by Exhibit A, attached hereto and made a part hereof."

The contract then goes on to provide as follows: "It is further understood and agreed that when and after this contract shall have been executed and The City shall be permitted to take water at nine (9) cents per one hundred cubic feet under the assignment of the nine (9) cent water contract to it, the said payment shall be for water service and not for the purchase of water; it being understood and agreed that the lessors are only transferring such rights as to furnishing water as they have acquired from the La Mesa, Lemon Grove & Spring Valley Irrigation District in their said contracts with said districts."

Attached to said contract is a copy of a resolution unanimously adopted by the board of directors of the Irrigation District, in which the president and secretary of the district are authorized to consent in writing "to the transfer of the existing contract between Cuyamaca Water Company and said District for water furnished and to be furnished to the East San Diego, Normal Heights and Kensington Park District. This consent is given, however, on the express understanding and in consideration that the assignee of said contract take the same subject to the understanding upon which said contract is now held by said Cuyamaca Water Company, to-wit: that the District shall not be obligated at any time to furnish more in any one year than the equivalent of a uniform flow of one million gallons of water per day." While it does not appear that any further consent was signed by the president and secretary of the Irrigation District, it does appear that the district acted upon the transfer by furnishing to the city the water it was obligated to furnish to the water company. It will be noted that in thus consenting to the transfer of this agreement, including the obligation to furnish water at the nine-cent rate, while the Irrigation District is careful to call attention to a limitation in the amount of water that the district is obliged to furnish in any one year, no objection is made to the recital in the transfer from the water company to the city that "said obligation to so furnish said water now so rests upon said district", and further, that the district is still obligated to furnish to the lessors water at nine cents per hundred cubic feet. It seems to us this throws considerable light upon the intention of the parties. The language used in the resolution that the district shall

not be obligated to furnish more than a certain amount of water "in any one year" is also significant. The record shows that the entire transfer of the water system from the water company to the Irrigation District, when finally consummated, was put through as of the date of the original option, April 5, 1924, so when this consent to the transfer to the City of San Diego was given by the district, nearly two of the three years had passed. The use of the words "in any one year", instead of words appropriate to one remaining year, indicates that at that time the Irrigation District still considered the obligation a continuing one.

A further indication that the Irrigation District did not consider that their obligation to furnish this water ended with the three-year period, during which it had been agreed that no re-rating or rehearing should be asked for, is found in the fact that, while under the terms of the contract this three years expired on April 5, 1927, the Irrigation District continued to furnish water at the rate named until March 1, 1929, at which time their contention in this regard was first brought to the attention of the respondent.

For the reasons set forth we conclude, as an answer to the specific questions which the parties, by stipulation, have submitted as involved herein: 1. That the appellant Irrigation District has not the right to fix and determine the price to be paid by the respondent city for water furnished for distribution to the individual consumers in East San Diego, Normal Heights and Kensington Park under the terms of the option and contract mentioned. 2. That the Irrigation District may be enjoined from discontinuing or shutting off such water for the nonpayment of a rate fixed by the district in excess of that named in the contract.

We think, however, that from that portion of the judgment reading as follows: "It is Ordered, Adjudged and Decreed that the defendants and each of them be and they are hereby restrained from discontinuing or shutting off the supply of water heretofore furnished to the plaintiff as set out in the Complaint herein or from the raising of rates for the service of such water until such time as the raising of rates therefor be authorized either by the Railroad Commission of the State of California or by the City of San Diego," the words "either by the Railroad Commission of the State of California or by the City of San Diego"

294

should be stricken out, and instead thereof the words "by some public rate-fixing body" should be substituted. And the trial court is directed to make such modification.

As so modified, the judgment is affirmed.

Marks, Acting P. J., and Warmer, J., *pro tem.*, concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on November 24, 1930, and a petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 29, 1930.