[No. F047094. Fifth Dist. June 26, 2006.]

TURLOCK IRRIGATION DISTRICT, Plaintiff and Respondent, v.
ALLEN ZANKER et al., Defendants;
TOWN OF LA GRANGE, Intervener and Appellant;
MODESTO IRRIGATION DISTRICT, Intervener and Respondent.

## COUNSEL

Nomellini, Grilli & McDaniel and Daniel A. McDaniel for Intervener and Appellant.

Cassel Malm Fagundes, Joseph H. Fagundes and Floyd W. Cranmore for Plaintiff and Respondent.

Joy A. Warren, Joel S. Moskowitz; Downey Brand, Jennifer L. Harder and Joseph S. Schofield for Intervener and Respondent.

## OPINION

**VARTABEDIAN, Acting P. J.**—The Town of La Grange (the town) appeals from a judgment partially against it in litigation concerning the scope of the town's right to receive treated water for domestic use and other needs of the town. Respondents Turlock Irrigation District and Modesto Irrigation District (together, the districts) own water rights subject to the town's claim of water rights, and the districts own the delivery and treatment infrastructure through which the town's water is supplied. On the primary issues raised in this appeal, the trial court found that the districts must continue to provide water to the town, but the reasonable cost of treating the water to make it suitable for domestic use may be passed through to the consumer. We affirm the judgment.

### Facts and Procedural History

Starting in 1871, the La Grange Ditch and Hydraulic Mining Company provided water for the town through an artificial channel, the La Grange ditch, which it had constructed primarily to deliver water to its dredge.[1] The

---

[1] Hydraulic mining apparently involved the use of water to dislodge exposed soil and gravel; the resulting slurry was run through systems of flumes, sluices, and other conduits where gold was extracted from the mix. (See *State of Cal. ex rel. State Lands Com. v. Superior Court* (1995) 11 Cal.4th 50, 77 [44 Cal.Rptr.2d 399, 900 P.2d 648].) Later, the dredge apparently replaced the original system for processing the slurry. (See *Trklja v. Keys* (1942) 49 Cal.App.2d 211, 213 [121 P.2d 54].) For present purposes, however, the distinction is irrelevant. The relevant point is simply that all such mining required substantial amounts of water, and delivery of water for

La Grange ditch began at Indian Bar on the Tuolumne River, several miles upstream from the town. While the Tuolumne River passed through the town, the town apparently never obtained water from the river at any location other than Indian Bar.

In a series of transactions beginning in 1906, the La Grange ditch and portions of the associated water right were sold to other mining companies and to electric power companies. In 1917, the La Grange ditch and the entire rights to water from it, 66 cubic feet per second (cfs), became vested in Sierra & San Francisco Power Company (Sierra).[2] In 1920, Sierra sold the right to 66 cfs for a period of six continuous months each year to Waterford Irrigation District (Waterford). That conveyance was subject to the right to water that Sierra, as recited in the contract for sale with Waterford, "is obligated to furnish for domestic purposes to the town of La Grange and its inhabitants, and the amount of water required for irrigating the orchard belonging to the La Grange Gold Dredging Company . . . , and the amount of water required for the operation of the Dredge of said La Grange Gold Dredging Company, which said excepted amounts of water shall not exceed in the aggregate six cubic feet per second."[3]

In 1921, the districts proposed to build the Don Pedro Dam on the Tuolumne River. The reservoir created by the dam would flood Indian Bar and part of the La Grange ditch. Accordingly, the districts needed to acquire Sierra's water rights; in order to do this, the districts were required to accommodate in some manner the existing users of water that had been appropriated at Indian Bar since 1871. Accordingly, Sierra conveyed its water rights to the districts subject to the rights of Waterford and the town. In return, the districts agreed, in part, to install "the necessary motor, pump and pipe line to supply the said requirements of the town of La Grange and its inhabitants with water for domestic purposes," to supply the existing requirements for mining and irrigation of the orchard, and "thereafter [to] carry out

---

that purpose clearly was the primary reason for construction of the La Grange ditch. Mining, of course, required miners and the attendant suppliers, mechanics, and other persons who make up a mining town, and those persons required water for domestic and town use, but those needs were derivative of the need for water to conduct the mining operation in the first place.

[2] Water itself is not subject to ownership in California by private parties. Instead, a party can own the right to use water. That right is subject to a requirement that the use be reasonable or beneficial. (See Wat. Code, §§ 100, 102.)

[3] In 1917, one of the intermediate owners of the water right sold to La Grange Gold Dredging Company the equivalent of two cfs for irrigation of the orchard and two cfs for operation of the company's dredge. While the water rights for the orchard were permanent, the conveyance provided that the right of water use for dredging would "cease and terminate upon final cessation of the dredging operations . . . [and] revert back to grantor, its successors and assigns." Construing the 1917 and the 1920 conveyances together, one reasonably—but not necessarily—could infer that the 1920 conveyance formalized the town's water right at two cfs.

all the obligations of [Sierra] with respect to" the town and its inhabitants. (The "said requirements" were stated as the "right of the inhabitants of the town of La Grange to water for domestic and garden purposes and for the needs of the town.")

Beginning no later than 1925, the districts began chlorinating the town's water supply. Over the following decades, the standards for domestic drinking water became increasingly strict. The districts upgraded the treatment and delivery system over time, but in 1982 the Stanislaus County Division of Environmental Health notified the district that further upgrades were necessary. The districts applied for a grant to build a new filter plant. In that connection, the districts submitted maps showing their intended service area and designating the number of connections to the system that the districts anticipated. The grant was approved and the districts built the new system at no substantial net cost to themselves or town residents. Service was provided within boundaries established by the districts, with some additional connections based on a history of connection to the system. Throughout the time from 1925 to the present, the districts have charged town residents $1.50 per month for each connection to the water system.

In 1992, state water quality authorities began requiring compliance with higher quality standards and in 1993 the Stanislaus County Department of Environmental Resources ordered the districts to install a new filtration system or else to switch to a groundwater supply source. (Surface water may contain "giardia cysts and enteric viruses," according to the compliance order.) The districts proposed to upgrade the system again and to implement a water conservation program to keep water use within the capacity of the upgraded system. State and local authorities approved this plan in 1995 with some amendments. The plan limited the number of connections to the system to 66 and required installation of water meters, in addition to other conservation measures.

For 75 years or more there have been complaints by residents of the town about the quality and pressure of water provided by the districts. These complaints continued as the districts tried to impose the conservation requirements, resulting in issuance of a preliminary injunction in the present case prohibiting the installation of meters and enforcement of the conservation rules until further order of the court.

The present case arose when Allen and Kristina Zanker, present owners of the orchard with irrigation rights from the La Grange ditch, connected their new home on the orchard property to the town's domestic water system. The districts sued, contending the Zanker home was outside the service area for the system and was an unauthorized connection. The town filed a complaint

in intervention, seeking a declaration that the districts' service area designation was invalid, that the conservation rules were unauthorized, that the quality and quantity of water delivered by the districts was inadequate, and that residents of the town were not required to pay the cost of treating the water. The complaint also challenged the districts' decision not to conduct an environmental impact study concerning the effects of the conservation rules. Finally, it alleged the districts' restrictions on water use constituted a compensable "taking" for Fifth Amendment purposes.

The districts opposed the complaint in intervention both on the merits and on the basis that the town, as an unincorporated entity, lacked standing. (The trial court deferred consideration of the standing issue until trial and ultimately determined that the town had standing "to both bring this action and to be bound by the decision of this court." The districts have not appealed from the judgment, and the issue of standing is not before us. We express no opinion about the scope and binding effect of the judgment upon others than the named parties.)

The matter came to trial before the court sitting without a jury on the causes of action relevant to this appeal. (Certain other causes of action involving the Zankers were deferred for jury trial.) The court issued a 42-page written statement of decision after the trial. As relevant to this appeal (the court also rejected most of the districts' defenses and they have not appealed), the court concluded the districts have an obligation to provide treated water to the town but the cost of treatment may be passed along to residents who receive water service. Further, the court concluded that, pursuant to statute, the districts have the right to impose reasonable-use restrictions on water provided to the town's residents. The court declined to establish boundaries or standards for water service, apparently concluding that the capacity of the present system was self-limiting under quality and capacity regulations imposed by government agencies. The court concluded the conservation rules were exempt from environmental review and did not constitute a "taking" for purposes of the town's inverse condemnation cause of action. The court entered judgment in accordance with the statement of decision.

The town filed a timely notice of appeal.

### Discussion

A. *Standard of Review*

The town contends we should review this matter de novo as a matter of law, since there are no contested, relevant facts. We reject this standard of

review because the trial court made many express and implied findings from conflicting evidence; in addition, the court construed relevant written documents in light of evidence (some of which also was in conflict) of the historical practice of the parties in implementing those documents.

We review the trial court's factual conclusions pursuant to the substantial evidence standard. We then determine whether, in this action for injunctive and declaratory relief, the trial court's application of the law based on the facts, when supported by substantial evidence, constituted an abuse of discretion. (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 390 [33 Cal.Rptr.3d 644].)

### B. *The Issues on Appeal*

The primary questions on this appeal are whether the districts must continue to provide water for the town and, if so, who must pay the cost of treating the water so that it is suitable for domestic use. Other issues include whether the trial court abused its discretion in refusing to designate a geographical area within which the districts must provide domestic water service and refusing to adjudicate questions about the quality of water delivered by the districts, as well as issues involving the districts' responsibility for providing water at sufficient pressure for firefighting purposes. We will begin, as did the trial court, with the water.

### C. *The Town's Right to Water*

 "To constitute a valid appropriation, three elements must always exist: (1) The intent to appropriate water and apply it to a beneficial use; (2) the actual diversion from a natural channel or an extraction from a ground-water basin; and (3) the application of water to a beneficial use within a reasonable time." (1 Slater, Cal. Water Law and Policy (1995) part E, p. 2-20.) The town, as far as our record shows, never diverted water from the Tuolumne River and never had any ownership interest in the artificial channel into which the water was diverted. While La Grange Ditch and Hydraulic Mining Company established appropriative rights to waters from the Tuolumne River, the town did not. Whatever the exact terms of its original access to water from the La Grange ditch, the town's rights clearly arose "as secondary customers of an appropriator under [some form of] contract[] for water deliveries." (*Id.* at p. 2-7.)

There was no evidence of any written contract between the original appropriator and the town. It undoubtedly is true, and the districts do not deny, that a contractual right to sufficient water for town purposes arose after 1871, whether by estoppel, third party beneficiary, or some other principle.

(See, e.g., *San Diego v. La Mesa etc. Irr. Dist.* (1930) 109 Cal.App. 280, 287 [292 P. 1082].) Although the town's right to water was respected—that is, the town apparently got sufficient water—from the time the La Grange ditch was built, the right was not set out in any of the deeds by which the ditch was conveyed six times from 1906 to 1920.

In a 1920 conveyance from Sierra (by that time the owner of the La Grange ditch and the water right) to Waterford, Sierra sold to Waterford all of its entitlement to water from the ditch during the growing season of May through the end of September each year. For the first time in our record, the conveyance recognized the right of the town to water by excepting from the transfer to Waterford "the amount of water which [Sierra] is obligated to furnish for domestic purposes to the town of La Grange and its inhabitants, and the amount of water required for irrigating the orchard . . . situate above the town of La Grange, and the amount of water required for the operation of the Dredge of said La Grange Gold Dredging Company, which said excepted amounts of water shall not exceed in the aggregate six cubic feet per second."

The next year, 1921, as the districts put together the necessary property and water rights for construction of the Don Pedro Dam and Reservoir, Sierra conveyed to the districts all of its interest in the La Grange ditch and the water right. This conveyance incorporated a contract, approved by the Railroad Commission (see *Henderson v. Oroville-Wyandotte Irr. Dist.* (1931) 213 Cal. 514, 529 [2 P.2d 803]), that provided for the continuing water supply for the town after the reservoir flooded Indian Bar and the upper portion of the La Grange ditch. (The Railroad Commission is now the Public Utilities Commission. See *Wyandotte Orchards, Inc. v. Oroville-Wyandotte Irrigation Dist.* (1975) 49 Cal.App.3d 981, 983–987 [123 Cal.Rptr. 135].) The language of the 1921 contract is at the core of this litigation.

In its recitals, the 1921 contract states, in part: "WHEREAS the title of the SIERRA COMPANY to the aforesaid LA GRANGE WATER RIGHT, System and Power House is subject to the following, to-wit: [¶] . . . [¶] (b) The right of the inhabitants of the town of La Grange to water for domestic and garden purposes and for the needs of the town . . . ." Later in the contract, the districts "agree to install the necessary motor, pump and pipe line to supply the said requirements of the town of La Grange and its inhabitants with water for domestic purposes, and of the [mining companies]; and the Irrigation Districts agree to take over at the time the possession of the ditch system, as

hereinafter in paragraph 5 provided, is delivered to them, and thereafter carry out, all the obligations of [Sierra] with respect to . . . the town of La Grange and its inhabitants . . . ."[4]

Thus, the 1920 conveyance specifies an aggregate limitation on the quantity of water reserved for the three uses (town, irrigation, and mining) but the 1921 conveyance does not specifically limit the quantity of water either for town use or in the aggregate. It would be possible to reconcile these provisions by inferring that Sierra only meant to preserve, not expand, its existing obligation when it transferred that obligation to the districts. However, it would also be reasonable to interpret the districts' obligation as a new one, limited only by the town's reasonable need for water, arising from the new circumstances, namely, a new reservoir and a new delivery system that did not exist when Sierra originally quantified the town's right to water.

■ The trial court resolved this ambiguity by reference to extrinsic evidence of the past practices of the parties. A consistent prior interpretation of a contract can reflect the intent of the contracting parties, and therefore govern the meaning to be attributed to the contract. (*Corwin v. Los Angeles Newspaper Service Bureau, Inc.* (1978) 22 Cal.3d 302, 314 [148 Cal.Rptr. 918, 583 P.2d 777].) Clearly there was substantial evidence to support the trial court's conclusion that the 1921 contractual obligation was limited to a maximum of .66 cfs or, in the terminology of the 1920 conveyance, 33 miner's inches. The record contains a report from the chief engineer of the Turlock Irrigation District to his board of directors, dated July 6, 1929, in which he states that the system has been designed to deliver "the 33 miner's inches required by the town . . . ." Again, in a memorandum from 1954, a district official describes the obligation of the districts as requiring delivery of 33 miner's inches for town use. At trial, a senior manager of the district testified that he had "never seen any documentation that would indicate anything more than 33 miner's inches would be—could be made available" to the town. A 1931 report by a state public health engineer reports the right as 33 miner's inches. By contrast, the town's claim is based solely on an inference from the absence of an express limitation on the town's water right in the 1920 and 1921 documents. The trial court was not required to draw that inference and the contrary inference is well supported by the evidence. The trial court did not err in finding that the town's right to water from the districts was limited to a maximum of 33 miner's inches or .66 cfs.

The trial court noted that the town's right to water from the districts was limited to use for "domestic and garden purposes and for the needs of the

---

[4] The town argues that it has an "unexercised riparian water right" that the trial court should have recognized. Such a claim is irrelevant to the present case, however. This case deals with the districts' obligation to deliver water, not with the town's right, if any, to obtain water directly from the Tuolumne River.

town," as stated in the 1921 contract. As a result of this limitation, the court found that the town was not entitled to use water from its domestic system for "commercial purposes," such as selling the water itself or using it to generate electricity. The court declined "to provide any comprehensive list of other domestic uses of water that would fall under 'the needs of the town.' "

The town contends on appeal that the court's limitation on the right to sell water is not supported by the evidence. It argues: "Unless the phrase ['needs of the town'] is to be rendered surplusage, it must be something more than domestic and garden purposes." We agree with this basic premise, but we reject the town's conclusion that the "something more" reasonably includes the sale of the town's water to nonresidents. We note other evidence established that there are a few commercial enterprises in the town, such as restaurants, food markets, and a saloon, as well as a school, post office, and other civic buildings, and there was no issue at trial concerning the use of water from the town water system by these nonresidential users. The only reasonable interpretation of the "needs of the town" language is the normal use of water by those engaged in commerce, education, and government in the town.

D. *The Obligation to Pay for Treatment of the Domestic Water Supply*

The trial court found that the districts "must provide treated water per the California Code of Regulations in meeting [their] contractual obligation to provide domestic water to the town of La Grange." This conclusion is supported both by certain of the language in the 1921 contract (districts "to supply the . . . requirements of the town . . . with water for domestic purposes") and by the long-standing practice of the districts in assuming responsibility for treating the water. (*Corwin v. Los Angeles Newspaper Service Bureau, Inc., supra,* 22 Cal.3d at p. 314.) We therefore reject Modesto Irrigation District's contention that the districts are required to do nothing more than deliver a quantity of river water to the town; they must also provide for treatment and distribution to the inhabitants of the town. We agree with the trial court that "water for domestic purposes," in light of past practices, requires delivery of potable water to the inhabitants.

The town contends, however, that the districts are required not just to provide potable water to the inhabitants of the town, but that they are required to provide it without cost to the inhabitants. The town argues that if the original obligation of the districts was to provide potable water in accordance with prevailing standards of potability, that obligation is not relieved just because more stringent modern standards increase the cost of fulfilling its obligation, citing as authority for this point *Wyandotte Orchards, Inc v. Oroville-Wyandotte Irrigation Dist., supra,* 49 Cal.App.3d at pages

986–987 ("Contracts should receive a reasonable interpretation and one which effectuates the parties' purposes as discerned from the entire agreement; the courts cannot rewrite a contract to avoid difficulty or hardship").

It seems clear from the record before us that prior to 1921 the town's right to water was a quantity right, not a right to water of any particular quality. Thus, when the right was first formalized in the 1920 conveyance, Sierra retained "the amount of water which [Sierra] is obligated to furnish for domestic purposes to the town of La Grange and its inhabitants."[5] Sierra never undertook to and, as far as our record shows, never did in fact provide treated water for the town: the water was taken from the river in an open canal that ran across 10 miles of cattle pasture, and residents were allowed to remove water from that canal in their own pipes for a flat monthly fee.[6] Thus, the record indicates that from the earliest times the residents were required to pay for water.

After the districts assumed the responsibility to deliver water, they created a water-delivery system where none had existed before. According to a May 19, 1931 memorandum from an engineer with the State of California Department of Public Health, "By 1925 the supply [from the open canal] was very bad, due to watering of stock in the ditch . . . . At the request of many of the consumers for better water, and also because of a desire to abandon the old ditch, a diversion was made in the Turlock Canal . . . ." At that time, the water was diverted into a pipe that led to a sump—a covered, concrete-lined pit approximately four feet by five feet by five feet.

From this sump, water was pumped to the town's water tank. Two lines led from the tank to the town. According to the memorandum, "When the Turlock Irrigation District made the change to the Turlock Canal they replaced the old ditch line by these two pipes and connected the consumers' pipes, that formerly took from the ditch, to these pipes. The District has no other distribution system than these two pipes that replace the old ditch."

The department of public health engineer reported that there were many complaints about the 1925 water system. However, "[n]o one claimed any sickness was caused by the water. Very few people drink the water straight. Most filter it in homemade filters and a very few boil it. Many others use 'springs' from old mining tunnels running under the town." Although the

---

[5] The present case does not present the issue of water service to a proposed use, such as an apartment complex or a tribal casino located in what historically has been denominated the town of La Grange. Accordingly, we express no opinion on the application of the 1921 water right to such a proposed use.

[6] A May 19, 1931 memorandum states that the "flat rate" was charged "[p]rior to 1925." In context, the reference appears to be the entire period from 1871 to 1925.

1931 report does not indicate that the water was being chlorinated, and does state that the water "contain[ed] moderate pollution," a 1968 report states, "The Districts since 1923 have been pumping clorinated [*sic*] canal water to the town of La Grange." For present purposes, however, the important point is that the districts continued to charge residents for water, at the rate of $1.50 per month.[7]

Collection efforts on delinquent accounts seem to have been fairly spotty—or even nonexistent—and the districts did not discontinue service for nonpayment. But, the districts never delivered water for free. The districts also consistently asserted that delivery of the water (not treatment of it) was their only responsibility under the 1921 contract. Nevertheless, from a very early date the districts elected to fulfill their contractual duty to deliver water by operating a domestic water supply system, which was subject to inspection and regulation by state and local authorities, most recently under the terms of the California Safe Drinking Water Act, Health and Safety Code section 116275 et seq. As a result, as the trial court concluded, regulations adopted pursuant to Health and Safety Code section 116375 require the districts to furnish water that meets certain standards of purity. (See Cal. Code Regs., tit. 22, § 64650 et seq.)

Neither this obligation nor the original 1921 undertaking to provide a domestic water supply, however, requires the districts to provide such water free of charge. The town has cited no language in any conveyance, contract, or other document that would support a finding that the districts were required to provide free water. By contrast, the evidence shows that, from the very earliest days, the owners of the La Grange ditch charged those residents of the town who took water from the canal.

When there is no requirement in the districts' contract setting a price at which they are required to deliver water, the boards of the districts are empowered by statute to "fix and collect charges" for water delivered outside the boundaries of the districts. (Wat. Code, § 22280, subd. (c).) The cost of water in modern times includes the cost of treating the water. Substantial evidence supports the trial court's finding that the districts are permitted to

---

[7] The town also argues that "it is only fair" that the districts should be estopped to charge for water treatment because they "deprive[d] La Grange of its original supply at Indian Bar." This argument implies that if the districts had not built their dam, the town would still be able to take potable water directly from the La Grange ditch. However, all of the evidence arising from the early days shows that the degradation of water quality was not caused by the change in the diversion point but, instead, was due to the access of cattle to the open canal. In other words, the water that was labeled undrinkable in 1931 would have been similarly undrinkable if the Indian Bar diversion point had been maintained.

pass through to the town's water subscribers the cost of treating the water to bring it into compliance with prevailing, government-imposed standards of quality.

We note that the evidence shows the willingness of the districts, at various points in the past, to turn over the domestic water system to a special district formed to operate the system, if the residents of La Grange chose to operate through such a district. In the absence of such a transfer, it is apparent that continuing water-quality regulations may, at various points in the future, require capital improvements by the districts to the system. As with the operating costs of the system, we agree with the trial court's finding that the districts are entitled to recover the costs of necessary maintenance and capital improvements, necessary for the treatment of water, from the town's water subscribers. (See Wat. Code, § 22280, subd. (c).)[8]

The town also contends the inhabitants are not required to pay for treated water for "garden purposes," even if the districts are entitled to charge treatment costs for domestic water. It contends the districts should either install a separate system for delivery of untreated water for garden purposes or else that the districts should not charge for the treatment of garden water since the districts deliver treated gardening water through a unified system "for their own convenience." There is, however, nothing in the relevant contracts, conveyances, or past practices of the parties that requires the districts to operate a secondary water delivery system dedicated to untreated water for garden purposes. The districts are entitled to deliver through a unified system "water for domestic purposes" in an amount sufficient to meet the town's requirement for "water for domestic and garden purposes and for the needs of the town," as required by the 1921 contract.

E. *The Water Conservation Rules*

The town contends the districts were without authority to adopt water conservation rules for the La Grange domestic water supply system. These rules include a requirement that water use be metered, a prohibition on wasting water, and a designated-watering-day program for outdoor water use. The town contends these water-use rules are a sham, imposed so the districts do not have to improve the treatment facility to provide sufficient water. The town also contends, in passing, that the regulations impair the obligation of the water delivery contract, in violation of the United States Constitution.

---

[8] The districts have not appealed from the portion of the judgment requiring them to bear the cost of any capital improvements necessary, in whole or in part, in the language of the 1921 conveyance, "to deliver the volume of water to La Grange per the 1921 contract." The court limited the districts to the recovery of maintenance and capital costs incurred "solely for the purposes of treatment of water."

There are, undeniably, two ways of viewing this portion of the dispute. One is that the treatment facility is adequate to provide water service pursuant to reasonable conservation rules typical in California. The other is that the treatment facility is inadequate at times to provide unlimited water to the inhabitants of La Grange if they are not subjected to conservation rules. While each view is logically coherent, the first view must prevail as a matter of the public policy clearly articulated in the Constitution and laws of the state.

The right to use of water has long been regulated in California, both to protect water users and to protect the resource itself. The regulatory scheme was invoked in the creation of the 1921 water right: Sierra, as the operator of a public utility, was required to obtain permission of the Railroad Commission to sell its water rights to the districts and was not permitted simply to terminate service to the town because it found a better buyer. The Railroad Commission approved the contract for sale, which, inter alia, created the districts' obligation to serve the town and the right of the town's inhabitants to water for "domestic and garden purposes and for the needs of the town."

■ The rights and obligations created thereby were subject, from the beginning and as a matter of law, to the regulation under the police power and, subsequently, under article X, section 2 of the California Constitution. (See *Gin S. Chow v. City of Santa Barbara* (1933) 217 Cal. 673, 703 [22 P.2d 5].)[9] As relevant here, article X, section 2, provides that the right to water or to the use of water from any natural stream is "limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use" of water.

■ This constitutional limitation on unreasonable use of water is implemented in a myriad of ways but, as relevant here, it is implemented through Water Code section 22258 (section 22258), which provides that an irrigation district that provides water to users outside the district "may regulate the use of water so furnished." Pursuant to this statutory power, the districts have adopted the rules for the La Grange domestic water system. There is no claim that these rules are in any way unreasonable; instead, the town merely claims they are an unauthorized attempt to "impose [the districts'] own views on La Grange's use of water."

---

[9] Because such rights and duties are always subject to regulation under the police power, exercise of the police power constitutes neither a constitutional "taking" nor an unconstitutional impairment of the obligation of contract. (See *Imperial Irrigation Dist. v. State Wat. Resources Control Bd.* (1990) 225 Cal.App.3d 548, 562–563 [275 Cal.Rptr. 250]; *People ex rel. State Water Resources Control Bd. v. Forni* (1976) 54 Cal.App.3d 743, 753 [126 Cal.Rptr. 851].)

■ The town bases its claim that the rules are unauthorized on a faulty reading of section 22258. That section states that it applies whenever a district is "required by law or provisions of agreements under which all or part of the water supply of the district was acquired" to furnish water outside the district.[10] The town reads this provision as if it applied only when the district acquired water for the purpose of supplying customers outside the district. The town argues: "[S]ection 22258 has no application to this case since the water supply was not acquired to furnish water outside the districts' boundaries—the water was acquired to furnish water within the District, subject to the rights of La Grange." This construction is clearly wrong.

The plain grammar of section 22258 requires that the clause "to furnish water outside its boundaries to consumers whose rights to service were at the time the supply of water was acquired by the district enforceable by reason of their status as persons of the class for whose benefit the water was appropriated or dedicated" modifies both an obligation established "by law" and an obligation established by "agreements."

■ If the clause only defined the "agreements" to which the section applies, the alternative provision would read: "A district required by law . . . may regulate the use of water so furnished," clearly a nonsensical construction. Instead, as with other disjunctive sentences, the section could be restated in two separate sentences, as follows: "A district required by law to furnish water outside its boundaries to consumers whose rights to service were at the time the supply of water was acquired by the district enforceable by reason of their status as persons of the class for whose benefit the water was appropriated or dedicated may regulate the use of water so furnished. Further, a district required by provisions of agreements under which all or part of the water supply of the district was acquired to furnish water outside its boundaries to consumers whose rights to service were at the time the supply of water was acquired by the district enforceable by reason of their status as persons of the class for whose benefit the water was appropriated or dedicated may regulate the use of the water so furnished." We conclude section 22258 was intended to, and does, apply to exactly the circumstances in the present case.

### F. The System's Boundaries and the Limitation on Hookups

The trial court held that the town was entitled to a maximum of 33 miner's inches of water, using "southern" miner's inches, in which 50 miner's inches

---

[10] The full text of section 22258 is: "A district required by law or provisions of agreements under which all or part of the water supply of the district was acquired to furnish water outside its boundaries to consumers whose rights to service were at the time the supply of water was acquired by the district enforceable by reason of their status as persons of the class for whose benefit the water was appropriated or dedicated may regulate the use of water so furnished."

equals one cubic foot per second. The evidence established that the present water treatment plant has a capacity of 130,000 gallons per day. None of the parties has attempted to relate these two different forms of measurement of flowing water. It is not necessary to the present opinion that we establish the equivalencies with a precision that would require judicial notice. However, it appears that 33 miner's inches, viewed as .66 cfs, is somewhat more than 400,000 gallons of water per day. (See <http://www.western-water.com/CFS_formulas.htm> [as of June 26, 2006].) Thus, there is a great disparity between the maximum amount of water to which the town could be entitled, if the water were put to reasonable and beneficial use, and the present capacity of the treatment plant to supply domestic water.

When the districts applied in 1985 for the original grant to install a treatment facility, they designated a service area composed of 61 existing connections and an estimated maximum of 74 connections. The grant application also apparently included a map that purported to show the existing service boundaries of the water system (a portion of the grant was to replace existing distribution lines). When the district issued its rules for operation of the domestic water system in 2001, it adopted this boundary map as the system's "service area." The rules, in turn, state that "[n]ew service connections will be allowed only for existing Premises currently within the Service Area."

The town sought in its complaint in intervention to have the claimed service area boundary declared inoperative. In its statement of decision, the trial court found that there were no established boundaries for the town, that the districts had made exceptions to their own "proposed boundary" for the service area, and that the historical evidence was not sufficient to determine "whether a party should be allowed to hook up based upon a preexisting historical use." The court noted that, at present, the number of hookups the treatment plant could support was "determinative of capacity" for the system, and that this number of hookups had not changed significantly in the past 70 years. The court concluded it could not and should not establish service boundaries in the present case because the system was already operating under restrictions from the Stanislaus County Department of Environmental Resources and "the decision of this court is not going to change the DER noncompliance findings already in existence." In the portion of the statement of decision involving the Zanker claims, the trial court permitted the Zankers to remain connected to the La Grange system (on certain conditions), even though their residence was claimed by the districts to be outside the service area. The court stated: "In doing so the court notes the lack of any definitive boundaries of the [La Grange water system] or La Grange . . . ."

Despite the trial court's express findings that there was no established boundary of the water system service area, the town contends on appeal that

the court's "approval of the [districts'] regulations which contain the boundary" resulted in "a *de facto* determination of the boundary." The town does not refer us to anywhere in the record where the trial court gave overall approval to the districts' rules, apart from the water conservation portions of those rules. The court determined that adoption of the whole package of rules did not require an environmental impact report and did not constitute a "taking" for purposes of inverse condemnation law, but it did not address the validity of the designation of the service area, as far as we can determine.

■ The town also contends the trial court had an affirmative duty to set service area boundaries because the "boundary issue was one upon which specific requests for a decision were made." The trial court has discretion whether to grant or deny declaratory relief upon consideration of all the circumstances. (Code Civ. Proc., § 1061.) In this case, the court did not abuse its discretion. The very nature of the complaint in intervention would have made any declaration by the court speculative and merely advisory: "the town" had not been denied connection to the system; "the town" did not have a general plan to regulate growth that was somehow in conflict with the districts' refusal to extend service;[11] and the only parties before the court who had been denied service by the districts were permitted by the judgment to remain attached to the system.

We agree with the trial court's implied conclusion that negotiation between the town and the districts or, failing that, resort to county administrative procedures, is by far the preferable way to determine these issues. An application for service three miles from the town center, for example, might present a very different picture than a similar request after the town has actually grown that far beyond its present size and the water system has grown to accommodate the earlier growth. It is sufficient at this point to note that the volume of water reserved for town use, because significantly greater than present demand, would require the districts to provide reasonable infrastructure for growth but the obligation of users to pay for expanded treatment capacity would seem to require a commitment to such growth by the current system users, or a system of connection and impact fees on new users. In any event, creation of comprehensive growth and water-system expansion plans is more suitably undertaken, at least initially, by the relevant administrative agencies. (See *Jonathan Neil & Assoc., Inc. v. Jones* (2004) 33 Cal.4th 917, 934 [16 Cal.Rptr.3d 849, 94 P.3d 1055].)

---

[11] While the town may have had sufficient collective identity to justify its standing to intervene in the action (a matter about which we have reserved judgment), it has no governmental structure or powers that could be exercised to permit or refuse permission to build.

### G. *CEQA*

 The California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) requires public agencies to consider the environmental consequences of certain actions before the action is taken. (All further statutory references are to the Pub. Resources Code.) Initially, an agency planning to undertake a "project," as defined by the statute (§ 21065), must determine whether the project is exempt from CEQA, either due to a statutory exemption or a regulatory exemption. (See Cal. Code Regs., tit. 14, § 15300.) If a regulatory exemption, known as a "categorical exemption," is applicable, no further environmental review is required for a project, unless an "exception" to the exemption is applicable. (See Cal. Code Regs., tit. 14, § 15300.2.)

In the present case, the districts and the trial court found that implementation of water conservation rules by the districts was exempt from CEQA and that no exception to that exemption applied. The town disagrees with both of those conclusions. It contends the implementation of water use rules does not fall under the "Class 1" exemption for the "operation, repair, maintenance, . . . or minor alteration of existing public . . . structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of use . . . ." (See Cal. Code Regs., tit. 14, § 15301.) It also contends that if this exclusion were otherwise applicable the current project is excepted from the exclusion because "there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances" (Cal. Code Regs., tit. 14, § 15300.2, subd. (c)) and because the project "may cause a substantial adverse change in the significance of a historical resource" (Cal. Code Regs., tit. 14, § 15300.2, subd. (f)).

#### 1. *The Class 1 Exemption*

The town contends the Class 1 exemption for existing facilities is inapplicable because "the [water conservation rules] do not operate the water system—they regulate the water use of the consumer after it has left the public system and been delivered." The town does not further explain this contention, and its meaning is not immediately obvious. The rules clearly pertain to the operation of the water system, both the treatment plant and the delivery infrastructure. Not only do the rules attempt to conserve water through the use of meters, they also seek to maintain adequate pressure in the system through an odd-even outdoor watering scheme. The rules regulate only the withdrawal of water from the system, not its use thereafter.

In *Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786 [124 Cal.Rptr.2d 731], the appellate court found applicable the Class 1 exemption for a parking ordinance that allocated free, onstreet

parking to neighborhood residents who obtained a permit. The court held that the ordinance "involves the 'operation' of such existing facilities (in the sense that curbside parking is 'operated' by using parking permits, enforcement personnel and ticketing as a form of enforcing the legislatively prescribed use), the 'minor alteration of existing public or private structures, facilities, mechanical equipment, or topographical features' (i.e., the signage needed to identify particular curbside spots as permitted parking or not), and 'negligible or no expansion of use beyond that previously existing,' because no additional parking spaces or structures are being added to the parking stock in the relevant area." (*Id.* at p. 793.)

In the present case, the rules regulate access to delivered water. The sole purpose for operation of a water system is the delivery of water. As in *Santa Monica*, the rules involve operation of an existing facility with only minor alteration of the facilities (installation of meter mechanisms on existing meter connectors) and the rules do not permit expansion of previous use. (In fact, they seek reduction of individual use and limit growth of the system as a whole.) (See *Santa Monica Chamber of Commerce v. City of Santa Monica, supra,* 101 Cal.App.4th at p. 793.)

### 2. *Exceptions to the Class 1 Exemption*

The town contends the water system rules cannot qualify for exemption from CEQA because, as phrased by the administrative regulations, "there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Cal. Code Regs., tit. 14, § 15300.2, subd. (c).) "Significant effect on the environment" is defined as "a substantial *adverse* change in the physical conditions which exist in the area affected by the proposed project." (Cal. Code Regs., tit. 14, § 15002, subd. (g), italics added.) The town lists the unusual circumstances as "the unusual relationship of the districts and the town concerning the water system . . . [and] the evidence concerning sufficiency of the water supply for fire fighting." Further, "[w]ater for landscaping is extremely important where there is great fire danger in a dry foothill town such as La Grange."

In the first place, even if these circumstances were "unusual" in some sense, there is no showing that the circumstances operate through the rules to create a reasonable possibility of a significant adverse effect on the environment. In other words, the question is not so much whether La Grange is unique, but whether that uniqueness could possibly *cause* the rules to have a significant effect on the environment. (See *Santa Monica Chamber of Commerce v. City of Santa Monica, supra,* 101 Cal.App.4th at pp. 800–801.)

In addition, the circumstances are not shown to be unusual. (See *Santa Monica Chamber of Commerce v. City of Santa Monica, supra,* 101

Cal.App.4th at p. 801.) Virtually every foothills town in the central Sierra Nevada is in a dry environment with significant fire danger. Every unincorporated town is served by a third party water provider, if the town has a centralized water system at all, since the town, by definition, has no corporate powers that would permit it to operate a municipal water system. The "evidence concerning sufficiency of the water supply for fire fighting" may have established an unusual circumstance, in the sense that, presumably, the water supply is sufficient in most communities to permit operation of fire equipment, but the conservation rules do not *adversely* change the physical condition (presumably, insufficient water pressure and quantity): if the conservation rules have any effect, it will be to increase the capacity of the system to deliver water to firefighting equipment when necessary, because the rules attempt to reduce the nonfirefighting demands on the system.

The town also contends the "historic resource" exception to the Class 1 exemption is applicable in the present case. "A categorical exemption shall not be used for a project which may cause a substantial adverse change in the significance of a historical resource." (Cal. Code Regs., tit. 14, § 15300.2, subd. (f).) The town notes that the trial court agreed that the town itself is a historical resource and one particular building in town is a historical landmark. The town argues: "Certainly, if outdoor usage is reduced and riparian, natural and ornamental landscape are not watered or are not watered as frequently, significant adverse change and even fire may follow. A living, breathing town potentially changing to a parched shell of what it has been would be a substantial adverse change."

The trial court found there was no substantial evidence of a possibility that the water conservation rules would adversely impact any historical resource or structure. The town has not cited any such evidence on appeal. Our own review of the water conservation rules reveals that the rules do not significantly limit the amount of water used by any inhabitant of the town, although the use of water meters might make such use more expensive. There was no evidence that the alternate-day outdoor watering requirement, common in the more arid regions of California, poses any danger to the maintenance of any landscaping scheme although, once again, the cost of water might convince a resident to forego a tropical landscape in favor of one based on plants native to the area. That, however, is a far cry from any possibility the water conservation rules would create "a parched shell of what [the town] has been."

In summary, the trial court did not err in concluding that no exception applied to undermine the districts' assertion of the Class 1 exemption from additional CEQA review.

## Disposition

The judgment is affirmed. Respondents are entitled to costs on appeal.

Gomes, J., and Dawson, J., concurred.